**NEW ENGLAND TELEPHONE & TELE-
GRAPH COMPANY**

v.

**PUBLIC UTILITIES COMMISSION et al.**

Supreme Judicial Court of Maine.

March 24, 1976.

Pierce, Atwood, Scribner, Allen & McKusick, by Vincent L. McKusick, Everett P. Ingalls, III, Portland, for plaintiff.

Horace S. Libby, Public Utilities Commission, Thomas R. Gibbon, Augusta, Captain Robert O'Neil, Office of the Judge Advocate Gen., Dept. of the Army, Washington, D. C., for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

On October 25, 1974 New England Telephone & Telegraph Company ("New England") filed a petition for "interim" rate relief with the Public Utilities Commission ("Commission"). On March 11, 1975 the Commission denied the petition. New England then, on April 7, 1975, initiated the instant proceedings for judicial review by invoking this Court's "appeal" jurisdiction under 35 M.R.S.A. §§ 303 ("Section 303 appeal") and its additional "complaint" (in equity) jurisdiction under Section 305 ("Section 305 complaint.")

We dismiss New England's "Section 303 appeal" for mootness. We deny New England's "Section 305 complaint" and order judgment thereon in favor of defendant Commission.

## I. The Background and Framework of the Proceedings

The precursor of the instant proceedings was a proceeding in September of 1973 precipitated when New England filed with the Commission changes of its then current schedule of permanent[1] intrastate rates, tolls and charges. The changes were calculated to increase the company's gross annual revenues by approximately $6,300,000. Acting pursuant to 35 M.R.S.A. § 69, the Commission entered an order of suspension

---

1. All references in this opinion to rates as "permanent" rates signify that such rates are projected as operative for an *open-ended* time into the future expected to be of relatively lengthy duration. Thus, that rates are "permanent" in no way implies that the rates may not thereafter be changed by action instituted either by the utility, the Commission or the complaint of 10 persons.

thereby preventing New England's revised schedule from becoming effective, automatically, upon the expiration of 30 days under 35 M.R.S.A. § 64 (hereinafter "Section 64.") After a hearing and investigation concerning the "justness and reasonableness" of the changes of rates contained in New England's September 1973 filing, the Commission, on June 13, 1974, found said changes of permanent rates to be neither just nor reasonable. Accordingly, as authorized by 35 M.R.S.A. § 69, (hereinafter "Section 69") the Commission ordered New England to "substitute" a changed schedule of permanent rates under which New England would derive an increase in its gross annual revenues of $3,964,415.00 (instead of the $6,300,000 contemplated by New England's original filing). New England filed the Commission-ordered "substituted" changed schedule of permanent rates and shortly thereafter such changed permanent rates went into effect.

On October 8, 1974 New England again filed with the Commission changes of its schedule of intrastate permanent rates designed to produce a further increase of $21,000,000 in New England's gross annual revenues. Seventeen days thereafter (on October 25) New England filed the petition for "interim" rate relief the Commission's denial of which constitutes the subject of the instant review proceedings.

New England stated in its petition that it would need "interim" rate relief because it had ascertained that the Commission was about to issue an order of suspension to preclude effectiveness (at the expiration of 30 days under Section 64) of the changes in its schedule of permanent rates as filed by New England on October 8, 1974. The petition asked the Commission to authorize rates which would generate an additional $6,582,987 in New England's gross annual revenues and have "interim" effectiveness

2. The Commission ordered that this changed schedule take effect "subject to refund or surcharge depending upon the final Order of . . . [the] Commission [as forthcoming

pending the Commission's decision on New England's October 8, 1974 filing. New England suggested that the "interim" relief be accomplished by the Commission's withholding suspension of particular "parts" of the revised schedule filed by New England on October 8, 1974 thus to allow such "parts" to become effective automatically upon the expiration of 30 days from October 8th.

On November 6, 1974 the Commission did suspend in its entirety New England's October 8, 1974 permanent rate-change filing. On December 30, 1974 the Commission held a hearing on New England's petition for "interim" rate relief and approximately ten weeks later (on March 11, 1975) denied the petition. Thus, for a potentially maximum period of eight months from November 6, 1974—the time allowable to the Commission upon an order of suspension (under Section 69) for investigation of the justness and reasonableness of New England's October 8, 1974 permanent rate-change filing,—New England faced the prospect of living with the June, 1974 rates.

On July 3, 1975 the Commission made an order in which it stated that it

"[saw] no justification for permitting . . . [New England] to collect $21,000,000 . . ."

in additional gross annual revenues but authorized New England to file a changed rate schedule to yield an increase in New England's gross annual revenues of $9,500,000.[2] Such changed schedule of rates was filed by New England and went into effect on July 16, 1975.

Because of the Commission's action of July 3, 1975 New England has modified its claim before this Court. It has informed this Court that the Court's review of the correctness of the Commission denial of the petition for "interim" rate relief is to

in relation to New England's October 8, 1974 permanent rate-change filing] fixing a revenue requirement . . . ."

be confined to consideration of such injury as New England claims to have suffered by being deprived of an increase in revenues during the period from March 11, 1975 to July 16, 1975—the period, now entirely in the past, between the denial of New England's petition for "interim" rate relief and the July 16, 1975 effective date of the changed rates which would provide New England a $9,500,000 increase in its revenues.

On August 13, 1975 the Commission moved this Court to dismiss the proceedings in this Court on the ground that the relief sought by New England is beyond the power of this Court to grant under either a "Section 303 appeal" or a "Section 305 complaint."

The issue precipitated by the Commission's motion to dismiss may be more sharply delineated as follows. New England, in essence, maintains that the Commission's denial of its petition for "interim" rate relief left New England in the position of being required to charge during the period from March 11, 1975 to July 16, 1975 rates shown by New England to be unjust and unreasonable because confiscatory. Thus, says New England, this Court should now provide New England with a *remedy* for the loss of the increased revenues which New England claims it has shown were its *constitutional* entitlement during the entirely past period March 11 to July 16, 1975. The remedy New England seeks—as consistent with the prospectivity with which changes of rates are to be made effective—is that this Court order a rate surcharge to be paid by those who will be purchasing New England's services after this Court's order becomes effective and to continue operative until New England has received the amount claimed as its constitutional due for said past period.

The Commission's position is that under Maine's statutory scheme of rate regulation this Court, insofar as it has been authorized to review actions of the Commission relative to rates, lacks power to order

*remedial* relief, i. e., relief as to a situation entirely in the past—whether by "surcharge" on future ratepayers or otherwise —to compensate a utility for revenue losses alleged to have been unlawfully caused the utility during a period which, at the time of this Court's judicial review, is no longer continuing but has entirely terminated.

The issue thus presented requires us to examine the development of Maine's statutory scheme of rate regulation.

## II. The Development of Maine's Present System of Utility Rate Regulation

Maine's utility rate regulatory structure originated in 1913 when the Legislature created the Public Utilities Commission and gave it power to oversee the actions of "public utilities", as defined, restraining them within the bounds of "justness and reasonableness."

Prior to 1913, enterprises which the 1913 statute transformed into "public utilities" had been private businesses free to determine for themselves the type and quality of service they would provide and the rates they would charge. Consumers would accept services on the seller's terms or do without them.

The essence of the regulatory approach undertaken in 1913 was that the State's police power was exercised to impose regulatory mechanisms to ensure that a utility's facilities would be "safe, reasonable and adequate" and its rates, tolls and charges "just and reasonable." For these purposes, the Public Utilities Commission was established as the regulatory agency empowered to inspect the records of "public utilities", dictate the manner in which those records were to be kept and require the filing of certain documents with the Commission—including schedules

"showing all rates, tolls, and charges established and . . . in force at the time . . . .."

These schedules would be available for public inspection, and no changes of rates could become effective until expiration of a period of notice to the Commission.

It was a most important feature of the 1913 regulatory scheme that the utilities themselves set their *originally* effective rates. The Commission's power was to *react* in response to the effective rates as thus originally set by the utility, should it be necessary to impose changes in the interests of "justness and reasonableness." Thus, in 1913 the enterprises then in existence and which the 1913 Legislature transformed into "public utilities" filed with the Commission schedules of rates they themselves had established. P.L.1913, Chapter 129, Section 19. The 1913 statute mandated that such originally effective rates not exceed those charged by the utility on January 1, 1913.[3]

In addition to delineating the methodology by which a utility originally established its rates, the regulatory scheme was concerned with the mechanism for the *changing*, from time to time, of the rates currently in effect.

The 1913 legislation provided that changes in currently effective rates could be initiated by persons other than the utility as well as by the utility itself.

On its own motion, or upon the complaint of "ten persons", the Commission was empowered, under P.L.1913, Chapter 129, Section 41, et seq., to investigate the justness and reasonableness of a currently effective rate. Should a summary investigation indicate sufficient grounds for a formal public hearing, the Commission, upon notice to the utility, would hold a hearing, and in 1913 (as presently under Section 294 of 35 M.R.S.A.):

"If upon such formal public hearing the rates . . . shall be found to be un-

just, unreasonable, insufficient or unjustly discriminatory . . . the commission shall . . . fix and *order substituted therefor* such rate or rates, tolls, charges or schedules as shall be just or reasonable." (emphasis supplied)

A further authority was granted the Commission to deal with such rates as had become effective by virtue of any Commission "substitution" order. P.L.1913, Chapter 129, Section 55 gave the Commission authority

"at any time upon notice to the public utility and after opportunity to be heard . . . [to] rescind, alter or amend any order fixing any rate or rates, tolls, charges or schedules or any other order made by the commission, and . . . the same shall . . . take effect as herein provided for original orders."

Under the 1913 regulatory scheme a utility could itself undertake to put into effect changes in its current permanent rates. Two courses were available to the utility. First, it could proceed under P.L.1913, Chapter 129, Section 48 to "make complaint" to the Commission

"as to any matter affecting its . . . charges with like effect as though made by any ten persons, firms, corporations or associations."

If a utility took this course, however, its *own entirely unilateral action* would not put into effect its desired changes of rates *prior* to the completion of the Commission's investigations of justness and reasonableness. Thus, the utility could derive no benefit from its "complaint" until the Commission entered an order fixing the "just and reasonable" changes of rates which the utility should "substitute."

However, by a second procedure available to a utility under the 1913 legislation,

---

3. Presumably, a newly organized public utility would do the same today by filing its own schedule of rates in accordance with Section 61, and the utility's rates thus filed—not being a change of an effective rate but an original

rate—would become immediately effective. Thus, presently, as in 1913, in theory, the *unilateral* action of the utility establishes its original rates.

the utility could accomplish, *entirely unilaterally*, an almost immediately effective change of rates without need to await completion of investigations which the Commission might undertake. By P.L.1913, Chapter 129, Section 23 the utility was given authority to file with the Commission a changed schedule of rates. Under Section 24 and, *automatically* upon the expiration of 10 days, such changed rate schedule would become the effective schedule of rates. Should the Commission then see fit, under Section 48 of Chapter 129 of P.L. 1913, to investigate the justness and reasonableness of the rates as effectively changed by the entirely unilateral action of the utility, the utility could maintain its changed rates as the effective rates until the Commission should find them unjust or unreasonable and order a different changed schedule of rates to be *"substituted."*

The above-described mechanisms, as provided in 1913 for changing currently effective rates, were all concerned with the effectuating of changes in the *permanent* rates of a utility. By P.L.1913, Chapter 129, Section 60 (now 35 M.R.S.A. § 311) the Commission was also given power

"*temporarily*, to alter, amend or, with the consent of the public utility concerned, suspend any existing rates, schedules or orders relating to or affecting any public utility." (emphasis supplied)

The Commission's exercise of this power was to be

"[w]henever the commission shall deem it necessary in order to prevent injury to the business of any public utility or to the interest of the people, or in case of any emergency which the commission may adjudge to exist, . . . ."

It is appropriate for present purposes that we stress one additional feature of the above-described 1913 rate regulation structure. We have indicated that under the 1913 scheme a utility not only *unilaterally originated* its effective schedule of rates

but also had power, were it to utilize the appropriate procedure, by its own *entirely unilateral* action to put into effect changes of its rate schedule—at least until the Commission, by resorting to appropriate proceedings as above-described, should find the utility's changed rates to be unjust or unreasonable and require the utility to file a *substituted* schedule in accordance with the Commission's determinations of justness and reasonableness. Once, however, the Commission subjected a particular utility to such an order for a *substituted* filing of rates, P.L.1913, Chapter 129, Section 45 provided that

"no change thereafter shall be made by any public utility in any such rates, tolls or charges . . . *without the approval of the commission.*" (emphasis supplied)

Thus, if ever the Commission was obliged to react to any rate schedule put into effect unilaterally by a utility with an order for a "substituted" rate schedule, under the 1913 legislation that utility was *forever after* deprived of the power to have a rate schedule filed by it become effective upon the expiration of ten days. Once subjected to a Commission order of substitution, the utility was required to

"make complaint as to . . . [a] matter affecting its own . . . charges . . .",

and await Commission action. Should the utility feel that higher rates were required, it could propose them to the Commission but, pending the investigation of justness and reasonableness, the utility was obliged to maintain the currently effective rates without change.

Herein lay the essence of the 1913 philosophy of utility rate regulation in Maine. As much as possible, the effectuation of "just and reasonable" rates was to be accomplished by the unilateral action of the utilities themselves. The policy premise was that the utilities could be largely self-regulating in discharging their responsibili-

ty to establish just and reasonable rates; the regulating function of government would be to provide a spur to utility self-regulation—the spur taking the form of the Commission acting as the police officer with a club waiting in the offing to step in once a utility should transgress the "rule of reason." The legislative assumption was that the Commission would be obliged to step in with an order for a "substituted" filing of changes of rates only infrequently.[4]

For reasons not presently apparent, in 1917 the Legislature deemed it essential to concentrate further attention upon those *first-time* situations in which a Commission investigation of the justness and reasonableness of changes of rates would result in a Commission order that the utility "substitute" a changed schedule of rates.

More specifically, the Legislature focused upon that facet of the problem likely to involve injury to *rate-payers*:—the power of a utility, upon 10 days notice to the Commission, to put into effect *entirely unilaterally* changes in its schedule of permanent rates to continue as the actually effective rates until, after investigation, the Commission would order the utility to file a "substituted" changed schedule of permanent rates conforming to the Commission's determinations of justness and reasonableness.

The Legislature sought to ameliorate this potential for injury to *rate-payers* by three inter-related changes of the regulatory system.

First, the Legislature (a) increased from 10 days to 30 days the period upon the ex-piration of which, automatically, a changed schedule of rates filed by a utility would become effective and (b) gave the Commission authority to order such changed rates to become effective before the expiration of the 30 days (P.L.1917, Chapter 135).

Second, the Legislature amended the statutory provision authorizing a utility to "complain" to the Commission concerning its own product, service, or charges by introducing a remedy to benefit the *rate-payers* who had paid any rate which

> " . . . the utility admits . . . was excessive or unreasonable, or collected through error, and . . . the utility has subsequently . . . published the rate to which the reduction is authorized in place of the rate which is admitted to be excessive or unreasonable."

In such situation the Legislature empowered the Commisson to ". . . authorize reparation or adjustment . . ." to *the rate-payers* (P.L.1917, Chapter 131).

Third, and most importantly for our present concerns, the Legislature in 1917 dealt directly with the above-described problem of "regulatory lag" as it could cause harm to *rate-payers* because of the power of the utility entirely unilaterally to put into effect changes of rates which would be in effect during a Commission investigation eventuating in the determination of the unjustness or unreasonableness of the utility's unilaterally effectuated changes.

---

4. The leading spokesman for the 1913 legislation to regulate public utilities made this clear on the floor of the Senate when he said:
 "Here is a public utility," they say, "we are running all right, we are not doing anything wrong, nor we won't do anything wrong, it ought not to be regulated, not touched upon. Perhaps it never will be regulated by this commission. A great many public utilities in this State for years will not be touched by the commission in any way, it won't be necessary to do it. But we believe the commission, should have authority, if necessary, to do it. Why, you have been out in the woods without a gun. . . . You were not likely to meet any wild thing. The chances were against that, that you wouldn't meet any. But when you want a gun you want it awfully bad. It may not be necessary in the case of many corporations, to do much with them in this State. They are doing a good business, honest and square. But you want power. You want authority." (1913 Legislative Record—Senate, March 18, p. 884)

The Legislature approached the matter in two strikingly different ways, differentiating the public utilities "engaged in the transportation of freight" from all other public utilities.

As to the public utilities engaged in the transportation of freight, one highlight of the 1917 amendment was that it removed the ban by which once a utility had become subject to a Commission order that it file a "substitute" changed schedule of rates, that utility was forever after deprived of power entirely unilaterally to make effective changes of its rates. By virtue of the 1917 amendment, all public utilities engaged in the transportation of freight *regained capability* to put into effect *entirely by their own unilateral action* (upon the expiration of 30 days) changes in their schedule of rates, subject to the one qualification that

> ". . . in cases involving an *increase* in an existing rate, . . . affecting the transportation of freight, if the commission shall find that such increase is unreasonable it may, by proper order, determine and fix the . . . rate, . . . which may thereafter be collected . . . *and no rate, . . . in excess thereof shall be filed within a period of one year after the making of such order* . . .." (P.L.1917, Chapter 44, § 2) (emphasis supplied)

Plainly, such restoration of power to utilities engaged in the transportation of freight entirely unilaterally to put into effect changes of their rates to continue as the actually effective rates during the period in which the Commission would be investigating their justness and reasonableness would accentuate, rather than relieve, the potential for injury to rate-payers arising from "regulatory lag." The Legislature, therefore, added as a measure to accompany the regained power of public utilities engaged in the transportation of freight unilaterally to put into effect changes in their permanent rates, a provision creating for the benefit of *rate-payers*

an *after-the-fact, remedial* mechanism, the "refund." By P.L.1917, Chapter 44 § 2 the Commission was empowered

> "by proper order, . . . [to] require the common carrier which has filed . . . [an] increased rate, . . . *to refund,* . . . to all persons *from whom charges have been collected* by virtue of the schedules under investigation, any and all sums collected in excess of the rate, . . . [as eventually] determined and fixed by the commission . . . ." (emphasis supplied)

By contrast, as to *all* public utilities *other* than those engaged in the transportation of freight, the 1917 legislation left in effect the existing law under which any such utility which had once become subjected to a Commission order requiring that it file a substitute changed schedule of rates was forever after deprived of power to put into effect by its own entirely unilateral action (upon the expiration of 30 days) changes of its rate schedule. Even so, the Legislature believed that there was still some problem of "regulatory lag", in its adverse effects upon *rate-payers,* which remained to be resolved. The problem existed as to those public utilities (not engaged in the transportation of freight) which would, *for the first time,* become subject to a Commission order requiring the filing of a substituted changed schedule of rates. Since any such public utility would not yet have lost the capability of putting into effect by its own entirely unilateral action changes in its schedule of rates—to continue as the actually effective rates during an investigation resulting in a Commission determination that the changed rates were unjust or unreasonable rates—the rate-payers would be suffering the injury, during the period of investigation, of paying rates which the Commission concluded were unjust or unreasonable.

The Legislature chose to deal with this problem by *avoiding* the *after-the-fact, remedial* mechanism of "refund" it had utilized regarding utilities engaged in the

transportation of freight. Instead, the Legislature resorted to the entirely *before-the-fact, preventive* mechanism of empowering the Commission to *suspend* (beyond the 30 days notice period) the operative effectiveness of the public utility's unilaterally filed changes in its schedule of permanent rates. By P.L.1917, Chapter 44, Section 1, the Legislature provided:

> "Whenever the public utilities commission receives notice of any change or changes proposed to be made in any schedule of rates filed with said commission under the provisions of law it shall have power at any time before the effective date of such change or changes, either upon complaint or upon its own motion, and after reasonable notice, to hold a public hearing and make investigation as to the propriety of such proposed change or changes. . . .
>
> "Pending such investigation and order the commission may at any time within said period preceding the effective date of any such schedule, by filing with such schedule and delivering to the public utility affected thereby a statement of its reasons for said suspension, suspend the operation of such schedule or any part thereof, but not for a longer period than three months from the date of said order of suspension; provided however, that if said investigation cannot be concluded within said period of three months said commission may in its discretion extend the time of suspension for a further period of three months; . . . ."

Another 10 years elapsed before, in 1927, the Legislature made one other change in Maine's rate regulatory system of importance to our present inquiry. The change concerned the bar, left intact by the 1917 amendment, operative against public utilities (other than those engaged in the transportation of freight) by which once any such utility had transgressed the "rule of reason" and had been subjected to a Commission order requiring filing of a substitute changed schedule of rates, the utility was forever after denied power to put into effect, by its own entirely unilateral action, changes in its schedule of rates. By P.L.1927, Chapter 64, any such public utility *regained such capability* upon the expiration of one year from the time of any Commission order requiring the filing of a "substitute" changed schedule of rates. Because of this change in 1927 it became apparent that, as to those public utilities not engaged in the transportation of freight, henceforth, the mechanism of most substantial importance to protect rate-payers from injury by "regulatory lag" would be the Commission's power of suspension.

Thus, as of 1927, the foundational contours of Maine's present rate regulatory structure had developed. The features most salient for our present purposes may be summarized as follows.

1. The public utility itself establishes its original permanent rates. Further, it is the action of a public utility which brings into effectiveness changes in its schedule of permanent rates. This is true because a public utility's schedule of permanent rates is put into effect in only two basic ways: (a) by the *utility's* filing a changed schedule of its permanent rates under Section 64 which, pursuant to Section 64, can become effective at the expiration of 30 days automatically, or before the expiration of 30 days if the Commission so orders; or (b) by the *utility's* filing of a *substitute* changed schedule of permanent rates pursuant to a Commission order so requiring —and as rendered upon a Commission investigation undertaken on a "10 persons complaint" (under Section 291), or the Commission's "own" motion (under Section 296), or the Commission's or the public utility's making "complaint . . . with like effect as though made by . . . 10 persons . . ." (under Section 298) or, lastly, as the Commission's response

(under Section 69) to a utility's filing, under Section 64, of changes in its schedule of permanent rates.[5]

2. Since changes in permanent rates become effective only by virtue of the utility's placing on file a changed schedule of rates—either, as clarified aforesaid, by the utility's own entirely unilateral filing or the utility's *"substituted"* filing in compliance with a Commission order for such substitution—all changes of a utility's permanent rates go into effect *only prospectively,* viz., *on or after* the date of either (a) the utility's own entirely unilateral filing putting the changed rate into effect, or (b) the utility's filing of such substituted changed rate schedule as the Commission has ordered.

3. Because (a) changes of a utility's permanent rates take effect only prospectively and (b) the ultimate "justness and reasonableness" of changes of rates is not established immediately but only after a period of Commission investigation, it may happen that the rates *actually effective* during a period of Commission investigation of the justness and reasonableness of changes are other than the "just and reasonable" rates (as ultimately determined by the Commission). Such "regulatory lag" can operate either to the detriment of a utility or the rate-payers.

4. In dealing with this problem of detriment occasioned by "regulatory lag", the Legislature gave to the Commission, as an ancillary power flowing from the Commission's power to make investigations and orders as to the "justness and reasonableness" of changes of a utility's schedule of permanent rates, *only* an authority concerned with the detriment to the *rate-payer,* as follows:

(a) under Section 298, *provided* that the utility *admits* that a "rate charged was excessive or unreasonable or collected through error" *and also*

". . . it further appears that the utility, . . . has filed a reduced rate in place of the rate which admittedly was excessive or unreasonable or collected through error",

the Legislature empowered the Commission to "authorize reparation or adjustment" to the rate-payers;

(b) as to utilities *engaged in the transportation of freight* and which, as such, could not be prevented by the Commission from placing into effect entirely unilaterally a change of rates to continue in effect during the period of Commission investigation of the justness and reasonableness of the changes thus effected, the Legislature

5. Essentially, Section 69 is concerned with the power of suspension that Section 69 confers upon the Commission. Its thrust, therefore, is basically to adapt to the suspension power the Commission's investigational and decisional methodology as operative under a Section 291 ("10 persons complaint") or a Section 296 (Commission's "own" motion) proceeding. Section 69 speaks of a changed schedule of permanent rates filed by a utility under Section 64 as becoming a "proposed" change of permanent rates when its operativeness has been suspended by an appropriate Commission order of suspension. As to such "proposed" change of permanent rates, Section 69 states that the Commission's investigation is to proceed as "upon complaint or upon its own motion" and prescribes as the order to be made that which would be "proper in a proceeding initiated upon complaint or upon motion of the commission in any rate investigation." In this manner, Section 69 is really incorporating,

by reference, the "order" provisions of Section 294 (as the order "properly" entered in a Section 291, Section 296 or Section 298 rate investigation) i. e., an order requiring that the utility "substitute" for the changed schedule of permanent rates initially placed on file under Section 64 the changed schedule of permanent rates determined by the Commission, after investigation, to be just and reasonable.

It is not entirely clear, however, whether by thus providing that a Section 69 order ". . . with reference to any . . . rate . . . proposed . . ." shall follow the functional pattern of a Section 294 order for the filing of a "substitute" changed schedule of permanent rates, the Legislature intended that such Section 69 order be subject—as are Section 294 orders—to the one year moratorium prescribed by Section 295. We presently intimate no opinion as to the correct answer to this issue.

empowered the Commission to afford the *rate-payers* an *after-the-fact remedy* by "refund", as prescribed by Section 70;

(c) however, as to the public utilities *other* than those engaged in the transportation of freight, the Legislature sought to protect the *rate-payers* against injury from "regulatory lag" by *preventive* measures. The Legislature gave the Commission no after-the-fact remedial powers, whether of "refund" or otherwise, but confined the Commission to the before-the-fact, preventive mechanism of *suspension*. Under Section 69 if the Commission acts before the expiration of the 30 day period prescribed by Section 64, the Commission is empowered to

". . . suspend the operation of such schedule or any part thereof, . . . [filed by the utility under Section 64] for a . . . period [no longer] than 3 months from the date of said order of suspension",

and

"[i]f said investigation cannot be concluded within said period of 3 months, . . . [the] commission may in its discretion extend the time of suspension for a further period of 5 months."

5. As to the other side of the "regulatory lag" coin, the detriment it could cause a *public utility*, the Legislature *entirely withheld* power from the Commission to deal with it by any mechanism originating as an ancillary incident of the Commission's powers to investigate and make orders concerning the justness and reasonableness of changes in a utility's schedule of *permanent* rates. *All* of the sections in which the Legislature authorized Commission investigations and orders concerning the justness and reasonableness of the changes in the schedule of the *permanent* rates of a public utility (not engaged in the transportation of freight)—i. e., the proceedings

under Section 69, Section 291, Section 296 or Section 298—are utterly silent on this subject.

The *only* power given the Commission capable of being utilized to deal with the adverse consequences to a *utility* (other than one engaged in the transportation of freight) resulting from the "regulatory lag" incident of a Commission investigation of the justness and reasonableness of changes in the utility's schedule of permanent rates is the power conferred by 35 M.R.S.A. § 311

". . . *temporarily*, to alter, [or] amend . . . any existing rates, schedules or orders relating to or affecting any public utility. . .", (emphasis supplied)

and the

". . . rates so made by the commission . . . take effect at such time and remain in force for such length of time as may be prescribed by the commission."

As to this Section 311 power of the Commission, two critical points must be stressed.

First, the power originates *entirely independently* of whether the Commission *happens* to be engaged in an investigation of the justness and reasonableness of changes of a utility's schedule of *permanent* rates. Thus, whether the Commission may exercise its Section 311 power to make "temporary" rates in connection with a pending investigation of changes of a schedule of permanent rates, the power does not spring from such investigational authority of the Commission; it exists independently and may be exercised by the Commission in various contexts other than the pendency of a Commission investigation of changes of a utility's schedule of permanent rates.[6]

---

6. A further point should be noted in this context of the *Commission's* (Section 311) power *itself* to make "temporary" rates—in contradistinction to a *utility's* effectuation of changes in its schedule of permanent rates, as achieved by the utility's filing of a changed

The second critical point to be emphasized is that under Section 311 the Commission acts *only prospectively*. "Temporary" rates are to be made to *prevent* either the continuance of an existing situation into the future or the occurrence of a situation anticipated as imminently about to occur. Nothing appears in Section 311 to confer power on the Commission to establish "temporary" rates as a means of providing an *after-the-fact reme-* dy for an *entirely past* situation no longer continuing at the time the Commission establishes the "temporary" rates.[7]

## III. The Law Court's Powers In a "Section 303 Appeal" and "Section 305 Complaint" Review of the Commission's Exercise of Powers

The foregoing analysis of the powers reposing in the Commission to regulate the justness and reasonableness of the rates of

---

schedule of permanent rates, effective either in its initial form entirely unilaterally or as a *substituted* filing in compliance with a Commission order. Since New England "suggested" in its petition for interim rate relief that it be effectuated by the Commission's withholding suspension of a "part" of the changes of the schedule of rates as filed by New England on October 8, 1974 (under Section 64), we think it advisable to comment upon the scope of the Commission's power under Section 69 to "suspend the operation of . . . any part . . . " of a utility's filing of changes in its schedule of permanent rates (in accordance with Section 64).

Should the Commission suspend only "part" of a changed rate schedule filed by a utility under Section 64, it would be erroneous to believe that the Commission thereby, as to that "part" of the schedule not suspended, has allowed said "part" to become effective only "temporarily" pending the outcome of its Section 69 investigations. To the contrary, the "part" of the schedule which has not been suspended takes actual effect under Section 64 as a change of the utility's permanent rates. It is then no longer a merely "proposed" change as to which the Commission's powers under Section 69 are operative but has become, rather, an actually effective change of permanent rates beyond the scope of the Commission's Section 69 powers. If the Commission should seek to act against such "part" of the schedule which, as not suspended, has become an actually effective change of the utility's permanent rates, the Commission may act only through a new proceeding, as instituted under Section 291, Section 296 or Section 298.

7. In this most important respect, the power of the Maine Commission to make "temporary" rates is far more restricted than the powers which may have been legislatively conferred upon the Commissions of other states.

Clear insight into the possible differences may be gained by examining, as a concrete illustration, the case of *New Rochelle Water Company v. Public Service Commission*, 31 N.Y.2d 397, 340 N.Y.S.2d 617, 292 N.E.2d 767 (1972). That case discusses the powers of the New York Public Service Commission to make "temporary" rates in connection with a Commission investigation of the justness and reasonableness of changes in a utility's schedule of permanent rates. The case reveals that, as the New York rate regulatory system existed prior to 1970, " . . . any loss sustained by the public utility during the suspension period had to be borne by it as a necessary incident of rate regulation." (340 N.Y.S.2d p. 625, 292 N.E.2d p. 773) In 1970, however, the New York Legislature gave the New York Public Service Commission power to deal with the detriment caused a utility by such "regulatory lag." The Commission could authorize "appropriate reparation to the company" if the Commission had taken action to suspend the effectiveness of the utility's proposed changes of rates pending investigation and had fixed as operative during any portion of the period of the investigation "temporary" rates eventuating as "inadequate" insofar as the changes of permanent rates ultimately found just and reasonable by the Commission were higher than the "temporary" rates.

We thus discern from the *New Rochelle* case that Maine's present rate regulation system takes the same approach as that of New York prior to 1970 concerning detriment to a utility resulting from "regulatory lag." Under the New York law prior to 1970, during the period in which the Commission is investigating the justness and reasonableness of changes in a utility's schedule of permanent rates—and pending which investigation the Commission has made an order by which it had either refused to fix "temporary" rates or had fixed "temporary" rates which the subsequent decision of the Commission on the changes of the permanent rates deemed just and reasonable reveals to have been inadequate—the "regulatory lag" detriment sustained by the public utility was beyond the power of the Commission to remedy. As the *New Rochelle* case states, it must be "borne by . . . [the public utility] as a necessary incident of rate regulation."

a public utility enables us, now, to put into acutely sharp focus the precise scope of the powers New England is asking this Court to exercise in the instant proceedings.

Our prior discussion has clarified that the only power available to the Commission to deal with New England's petition for "interim" rate relief is the power of the Commission, as conferred by Section 311, to make rates "temporarily."

As further clarified above, the extent of the Commission's powers, under Section 311, in making "temporary" rates is to act *purely prospectively and preventively.* In fixing "temporary" rates, the Commission deals with such situation as the Commission finds will be in existence *from, and for a "temporary" period after,* the date of the Commission's Section 311 order making "temporary" rates effective. Thus, Section 311 confers no power on the Commission to provide after-the-fact, remedial relief concerning any entirely past situation which has terminated before the Commission places "temporary" rates into effect.

Having thus delineated the precise nature, and scope, of the Commission's power addressed by New England's petition for "interim" rate relief, we proceed to evaluate the powers of this Court insofar as it is here acting under a "Section 303 appeal" and a "Section 305 complaint" (in equity) to afford judicial review of the Commission's denial of New England's said petition.

### III–A. The Law Court's Power Under the "Section 303 Appeal"

Section 303 provides that

"[a]n appeal from a final decision of the commission may be taken to the law court on questions of law in the same manner as an appeal from a judgment of the Superior Court in a civil action."

 We have held that New England's petition for "interim" rate relief ad-dresses the Commission's power under Section 311 to make temporary rates. The Commission's Section 311 power exists entirely independently of its power to make orders as to the justness and reasonableness of changes in a utility's schedule of permanent rates and is thus neither ancillary nor incidental to the Commission's powers as to permanent rates. The Commission's refusal to establish temporary rates, by denying New England's petition for "interim rate relief", is, therefore, a final (rather than interlocutory) order reviewable under this Court's "Section 303 appeal" jurisdiction.

We agree with the contention of the Commission, however, that New England's "Section 303 appeal" must be dismissed for mootness.

The Commission's refusal to establish temporary rates allowed continuation, as the currently effective rates during the period March 11, to July 16, 1975, of the changes in New England's schedule of permanent rates which had become effective in June of 1974. New England's "Section 303 appeal" claims that this was unlawful, indeed unconstitutional, action by the Commission because it was a failure of the Commission to prevent—although by Section 311 the Commission was empowered to prevent—confiscatory injury to New England during the March 11 to July 16, 1975 period.

Thus, New England's "Section 303 appeal" is asking this Court to adjudicate error by the Commission in failing to take *preventive* action as to a situation no longer continuing but fully terminated as of the time this Court's decision is to be forthcoming.

For this reason, New England's "Section 303 appeal" which addresses a jurisdiction of this Court confined to

"questions of law in the same manner as an appeal from a judgment of the Superior Court in a civil action",

must be held moot.

This Court has definitively established in relation to its "appeal" jurisdiction over judgments of the Superior Court entered in a context in which the Superior Court has power to act *only to prevent* injury (and not to furnish *remedial* relief) that the appeal becomes moot if the injury which it is claimed the Superior Court should have prevented is no longer continuing at the time the Law Court is to make its adjudication. *LaFleur ex rel. Anderson v. Frost*, 146 Me. 270, 80 A.2d ·407 (1951); *Cohen v. Ketchum*, Me., 344 A.2d 387 (1975).

■ Insofar as this Court's "Section 303 appeal" jurisdiction as to Commission action is operative ". . . in the same manner" as it would be in relation to a Superior Court judgment, the same principle of mootness is here controlling. Since the issue raised by the "Section 303 appeal" is whether the Commission committed error of law in refusing to prevent injury to New England when the Commission had power to prevent it during the period March 11 to July 16, 1975—the injury thus having been terminated and entirely in the past as of the time New England's "Section 303 appeal" is to be decided by this Court,—the "Section 303 appeal" has become moot.

The Commission's motion to dismiss the appeal on grounds of mootness must be

granted and the "Section 303 appeal" dismissed.

## III-B. The "Section 305 Complaint"

■ In approaching the scope of our "Section 305 complaint" jurisdiction as applicable to the instant proceedings we emphasize, initially, that we are limited under Section 305 to consideration only of issues of unlawfulness as embodied in the "unjustness or unreasonableness of a rate" or "constitutional" violations. Here, then, our "Section 305 complaint" jurisdiction does not extend to New England's contentions that the Commission acted in violation of statute in refusing to exercise power under Sections 291–298 and in concluding that "temporary" rates were not required to prevent "injury" to the utility or the public (under Section 311). These claims are reviewable only under our "Section 303 appeal" jurisdiction, and our dismissal of the Section 303 appeal has disposed of them.[8]

Thus, if New England's Section 305 complaint is to survive against the Commission's motion that it be dismissed, it can be only in the respect that New England is claiming that the Commission's refusal to grant New England "interim" rate relief was a constitutional violation because, in so acting, the Commission failed to prevent the continuance of confiscatory loss to New England from March 11 to July 16, 1975.[9]

8. Specifically, as to New England's contention that the Commission acted unlawfully in refusing to exercise power under Sections 291–298 to afford New England "interim" rate relief, the analysis underlying our disposition of the "Section 303 appeal" established that (1) the Commission has power under Sections 291–298 only in relation to changes in *permanent* rates and (2) because Sections 291–298 were concerned with permanent rates, the powers were coordinate in nature with those possessed by the Commission under Section 69 in connection with a utility's filing of a changed schedule of permanent rates under Section 64. Hence, Sections 291–298 conferred no authority upon the Commission to make *temporary* rates for a period "interim" to the Commission's in-investigation under Section 69 of a changed schedule of rates filed under Section 64, and

the operativeness of which the Commission had suspended (under Section 69).

9. In its Section 305 complaint and its briefs New England also asserts that the March 11, 1975 order was unlawful because it left in effect rates which were "unjust or unreasonable" in violation of 35 M.R.S.A. §§ 51 and 52. We interpret this, however, as only another form of a single substantive challenge being made by New England—the challenge of confiscation. New England's position throughout the instant proceedings has been that currently effective rates have not allowed New England opportunity to earn a *non-confiscatory* rate of return. New England persistently maintained that the Commission's references to a "fair" rate of return signified the minimum rate of return which would be "non-confiscatory."

With the unlawfulness of the Commission's refusal to grant New England "interim" rate relief postured in a constitutional frame of confiscation, New England argues that this Court must interpret its "Section 305 complaint" jurisdiction—in particular insofar as it is a jurisdiction sounding in *equity*—as conferring upon this Court a power *of its own* existing *independently* of any powers of the Commission to provide New England with an *after-the-fact remedy* as to confiscatory loss New England claims to have suffered during the entirely past period March 11 to July 16, 1975.[10]

New England's "Section 305 complaint" contention cuts even more sharply when it is formulated in relation to our holdings herein, as earlier delineated. Thus stated, New England's argument is: (1) this Court's "Section 305 complaint" jurisdiction sounds in equity; (2) as the preceding discussion has established, the "Section 303 appeal" jurisdiction of this Court is inadequate; (3) likewise, a judicial review under Section 305 without exercise by this Court of a power deemed possessed by it independently of the powers conferred upon the Commission would be inadequate since a remand of the case for the further action of the Commission would be futile by virtue of the Commission's lack of power to provide after-the-fact remedial relief as to a situation entirely in the past; and (4) since the injury inflicted upon New England is claimed to be a confiscation of New England's property and is, therefore, of constitutional dimension, Maine's statutory rate regulatory structure becomes unconstitutional *as applied in the instant context* should the Law Court interpret Section 305 to leave the Law Court without any independent power to afford a remedy for the alleged confiscation of New England's property during the period of March 11 to July 16, 1975.

New England points to *New England Telephone & Telegraph Company v. Department of Public Utilities*, 327 Mass. 81, 97 N.E.2d 509 (1951) in support of its position. New England contends that in that case the Massachusetts Court (1) exercised an *equity* review jurisdiction as conferred by a statute which became the model for this Court's "Section 305 complaint" jurisdiction, and (2) interpreted such statute to give the Court independent power to provide strictly remedial relief concerning entirely past confiscation of the utility's property (and, indeed, by an order having retroactive effectiveness).

We are satisfied, however, that we need not presently undertake evaluation of the decisional significance, or scope, of this Massachusetts case. We conclude that it is unnecessary that we decide in the instant situation whether Section 305 confers upon this Court an independent power, legislatively withheld from the Commission, to afford after-the-fact remedial relief as to the entirely past losses of a utility alleged to amount to confiscation (the remedy to take the form of an order of a surcharge upon those persons who will purchase the utility's services from and after the date upon which this Court enters its order).

The reason is that even if we hypothesize, arguendo, that this Court possesses such independent power under Section 305,

---

Thus, New England is not here contending that, even if above the confiscatory limit, the rates left in effect by the Commission's denial of "interim" rate relief were nevertheless "unjust" or "unreasonable." Rather, New England's claim is that the rates left in effect were "unjust" or "unreasonable" *because confiscatory*. Accordingly, we have treated New England's position as being confined to a claim of confiscation and to require evaluation, therefore, in constitutional, rather than merely statutory, terms.

10. New England pointedly clarifies that such independent power of the Law Court to afford *after-the-fact remedial relief as to* a situation entirely in the past need not involve necessity that this Court make an order which is to operate with *retroactive* force. Rather, New England seeks an order of this Court operative *only prospectively* in that this Court is asked to order a surcharge to be collected from those persons who will be the purchasers of New England's service *from and after* the date of the entry of this Court's order.

we must nevertheless conclude that New England has failed to establish the merits of its claim of confiscation as the gravamen of its "Section 305 complaint."

Acting on such hypothesis, then, we bypass decision of the Commission's motion to dismiss New England's "Section 305 complaint", as that motion may be taken to raise the issue that the complaint fails to assert a claim upon which this Court has power to grant relief. Thus assuming, without deciding, a disposition of the motion to dismiss in favor of New England, we address the merits of New England's "Section 305 complaint." We decide that the "Section 305 complaint" must be denied and judgment ordered in favor of defendant Commission.

The structure of New England's alleged proof of confiscation has relatively simple form. New England presented to the Commission expense and revenue data based upon the test year October 1, 1973 to September 30, 1974, as adjusted.[11] To such data New England applied all of the formulas, allowances and disallowances utilized by the Commission in arriving at its determinations underlying the Commission's June, 1974 order relating to changes in New England's permanent rates. The results thus obtained, New England argued, established a 7.10% rate of return for the adjusted test year. To the extent that it had thus earned a rate of return less than that rate of return which the Commission had taken as "fair" in its most recently past order relating to changes in New England's permanent rates (June

1974), New England claimed it had proved, *ipso facto*, that it was suffering confiscation.[12] Thus, the essence of New England's position is that merely by relying upon the Commission's most recent determination of a fair rate of return (as determined in a proceeding concerned with changes in New England's permanent rates) and "up-dating" it by applying it to newly developed data, New England, without any other showing being required, had proved confiscation.

Even if we evaluate this argument by resolving most favorably to the Company a point factually disputed by the Commission —that the Commission's determination in June of 1974 of 8.78% as a "fair" rate of return was a determination of the minimum rate of return necessary to avoid confiscation rather than a rate of return lying within a zone of justness and reasonableness above the minimum non-confiscatory level,—we are satisfied that New England has failed in its asserted proof of confiscation.

We so conclude because we reject the validity of the foundational premise upon which the entirety of New England's claim of confiscation rests:—that the 8.78% fair rate of return found by the Commission in its most immediately past evaluation of the justness and reasonableness of New England's *permanent* rates (June, 1974) carries over with *per se controlling* force as to the issue of confiscation raised by New England in the proceeding in which New England seeks *"interim"* rate relief.

11. New England originally presented figures based upon a test year ending July 1974. On December 3, 1974, however, New England moved to amend, and was allowed to substitute the later test year.

Two adjustments were made to the test year figures used. Both the June 1974 rate increase and a 1974 wage increase were annualized, that is, the test year figures were adjusted to reflect the revenues and expenses which would have been realized had both increases been effective throughout the test year. A third adjustment, for license contract expense, was included in the original

test year (August 1973–July 1974) but was deleted by the December 3 amendment.

12. New England originally claimed confiscation in the amount of $6,582,987 as representing the difference between an 8.78% rate and a 7.10% rate on New England's rate base for a period of one year. Since New England has modified its claim before this Court to confine it to a claim of confiscation between March 11 and July 16, 1975, the amount actually at issue in the instant proceeding is approximately 2.3 million dollars.

That the fairness of a given rate of return can never be determined without consideration of a multitude of circumstances which are highly susceptible to change has been clear since that concept was first defined by the Supreme Court of the United States. The classic definition of fair rate of return was stated in *Bluefield Water Works & Improvement Company v. Public Service Commission of the State of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L. Ed. 1176 (1923) as follows:

"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public . . . reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." (pp. 692, 693, 43 S.Ct. p. 679)

In *Bluefield* the Court observed:

"A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.

". . . [W]hether a rate yields such a return as not to be confiscatory depends upon circumstances, locality and risk, . . . ." (p. 693, 43 S.Ct. p. 679)

The *Bluefield* Court thus expressly recognized that events altering the perspective of the investor and creditor also alter the fair rate of return.

Here, New England claims to have established confiscation by a process of proof founded on the premise that a rate of return determined upon by the Commission as fair for purposes of the Commission's most recent assessment of the justness and reasonableness of changes in New England's *permanent* rates has *per se controlling* force in New England's subsequent

undertaking to have *temporary* rate relief "*interim*" to another pending proceeding concerned with further changes of New England's permanent rates. We are satisfied that by such argument New England overlooks, or ignores, that it has made a critical shift of material time-frame perspective, a shift which dissipates the validity of New England's position.

The essence of a *permanent* rate—and, therefore, of the Commission's determination of the fair rate of return upon which the justness and reasonableness of changes in permanent rates are dependent—is that it is to be operative for an *indeterminate* future period. As this Court observed in *Central Maine Power Company v. Public Utilities Commission et al.*, 156 Me. 295, 163 A.2d 762 (1960), the regulation of *permanent* rates seeks

". . . to assure fair returns to the Company for a future period extending until such time as there should occur severe but unforeseeable disturbances." (p. 343, 163 A.2d p. 787)

Accordingly, in the assessment of the justness and reasonableness of changes in a utility's permanent rates, and insofar as the fair rate of return determined upon is a reflection of what is thought necessary to assure the "confidence" of lenders and investors in the "financial soundness" of the utility to enable the utility to

"maintain and support its credit and . . . raise the money necessary for the proper discharge of its public duties", (262 U.S. p. 693, 43 S.Ct. p. 679)

lender and investor "confidence" is assessed as an attitude geared to an indeterminate period in the future.

When, however, from such a time continuum of the indeterminate future (1) a particular *discrete and determinate* period of time is extracted for isolated evaluation; (2) its limits are definitively fixed as "interim" to a pending proceeding in which changes in the utility's permanent rates are again being evaluated; and (3)

the issue concerns the rate of return which is to be held the minimum necessary to avoid confiscation *in specific relation to such fixed and short period,* this very process involves a change of circumstances materially affecting time-frame perspective and, therefore, sufficient to preclude the validity of attributing carry-over controlling force to a rate of return deemed fair in the Commission's most recently prior evaluation of changes of *permanent* rates.

Whereas prior to October 8, 1974 lenders and investors who may have believed that New England's earnings were unattractively low could only look forward to an indeterminate future of such earnings, once New England had made its October 8, 1974 filing of a changed schedule of permanent rates and the Commission had undertaken investigations to evaluate justness and reasonableness, lenders and investors knew: (1) the utility believed itself entitled to an increase of $21,000,000 in revenues; (2) the Commission was in process of investigating the propriety of such increase, and (3) the decision as to the changes of permanent rates which New England should have would be forthcoming by early July, 1975. These new facts and changes bore materially upon lender and investor confidence in the financial soundness of the utility during the determinate, short interval of time for which New England was seeking "interim rate" relief.

Since, therefore, the rate of return determined by the Commission to be "fair"

for the purposes of a most recently past proceeding dealing with changes in New England's permanent rates was projected relative to a lender and investor time-frame perspective fundamentally different from that operative as to New England's later petition for temporary rate relief "interim" to a subsequent proceeding also concerned with changes in New England's *permanent* rates, the fair rate of return utilized by the Commission in its prior order of June, 1974 may not properly be assigned *per se controlling* force to establish the minimum non-confiscatory rate of return for New England during the period March 11 to July 16, 1975.

▮ We conclude, therefore, that notwithstanding that New England may have proved a 7.10% rate of return at all times here relevant rather than the 8.78% utilized by the Commission in its June 13, 1974 order concerning the justness and reasonableness of changes in New England's schedule of permanent rates, proof of this differential does not *per se* establish that New England sustained confiscatory loss of revenues during the period March 11 to July 16, 1975.

▮ Moreover, our examination of the entire record satisfies us that New England failed to prove that its property had been confiscated from March 11 to July 16, 1975 by virtue of the level of rates which continued in effect during that time because the Commission had denied New England "interim" rate relief.[13]

---

13. The record contains additional information offered by New England that the Company had (1) postponed equity and debt issues it has previously scheduled for October and December 1974; (2) borrowed money at short term rates of 10.5% to 11% but earned only 7.10% on the plant so added to its rate base, and (3) nearly reached its short term borrowing limit.

We note, however, that New England itself adduced these additional matters not as having tendency to prove confiscation but rather as showing injury to the Company resulting from a confiscation which New England claimed had otherwise and independently been

established (by New England's showing that an "up-dating" of data demonstrated that current rates were yielding a rate of return less than the 8.78% rate of return previously projected as "fair" by the Commission's June, 1974 order).

In any event, we are satisfied that even when the above-described additional information is taken into account, New England failed to establish that the Commission's denial to it of "interim" rate relief left New England with rates at a level so low as to subject New England to a confiscation of its property during the short, determinate period March 11 to July 16, 1975.

The entries are:

(a) The Commission's motion to dismiss New England's "Section 303 appeal" is granted; said appeal is dismissed.

(b) New England's "Section 305 complaint" is denied; judgment for the defendant.

DELAHANTY, J., sat at argument but did not participate further in the case.

All Justices concurring.