**CENTRAL MAINE POWER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION**
**et al.**

Supreme Judicial Court of Maine.

Jan. 9, 1978.

Governor and the Executive Council which then existed.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by Gerald M. Amero (orally), George J. Marcus, Portland, Seward B. Brewster, Augusta, for the Central Maine Power Co., appellant.

Fitzgerald, Donovan, Conley & Day by Mark L. Haley (orally), Bath, for Maine Oil Dealers Ass'n, intervenor, appellant.

H. Cabanne Howard (orally), Asst. Atty. Gen., Augusta, for Attorney General, intervenor, appellant.

Horace S. Libby (orally), Thomas R. Gibbon, Public Utilities Commission, Frederick S. Samp, Augusta, for the Public Utilities Commission, appellee.

Collins & Crandall, P. A. by Wayne R. Crandall (orally), Rockland, for Martin Marietta Corp., intervenor, appellant.

Perkins, Thompson, Hinckley & Keddy by Thomas Schulten (orally), Portland, for St. Regis Paper Co., intervenor, appellant.

Verrill & Dana by Roger A. Putnam (orally), Portland, for Scott Paper Co. and Prime Tanning Co., intervenors, appellants.

V. Louise McCarren (orally), New England Regional Energy Project, Burlington, Vt., for Bruce M. Reeves, intervenor, appellant.

Southard, Hunt & Hebert by Frank E. Southard, Jr. (orally), Augusta, for Keyes Fibre Co., intervenor, appellant.

Before DUFRESNE, C. J., and WERNICK, ARCHIBALD and GODFREY, JJ.

WERNICK, Justice.

On December 1, 1975 Central Maine Power Company (Central Maine) filed with the Public Utilities Commission (Commission) revised schedules of rates. Acting pursuant to 35 M.R.S.A. §§ 64, 69, the Commission commenced investigation of the justness and reasonableness of the proposed rate revisions. Several persons were permitted to intervene in the investigation. By appeals pursuant to 35 M.R.S.A. § 303, and complaints under § 305, Central Maine and most of the intervenors claim errors in various of the Commission's orders during the course, and upon completion, of the investigation.

While we cannot say that the challenged Commission actions are entirely free of error, we conclude that the errors we discern require neither reversal nor modification of the Commission's rulings or orders. We therefore sustain the Commission's determinations against the attacks here made by Central Maine and the intervenors.

## I. The History of the Proceedings.

### I–A. The Rate Case Before the Commission.

After Central Maine had filed its revised schedules of rates calculated to generate an increase in annual revenue of approximately $21 million, the Commission, seeking to ensure a thorough investigation of the justness and reasonableness of the revised rates, utilized its suspension power under § 69. By an initial and second order of suspension the Commission undertook to prevent the proposed rates from becoming effective—by operation of law, pursuant to § 64—from, and after, January 1, 1976 until, and including, September 1, 1976.

During the months of April through August, 1976, the Commission held hearings and accepted briefs. On September 1, the Commission issued a "principal" decree in which it disallowed the rates Central Maine had proposed and authorized Central Maine to file, as just and reasonable, substitute

rates which would yield an annual increase in revenue of $11.4 million. These substitute rates were to be embodied in schedules which, after being approved by the Commission, would become effective as the Commission would subsequently prescribe. The decree also ordered Central Maine to submit to the Commission three alternative schedules covering the classes designated "residential" and "GS–1", preparatory to a hearing on *rate design* fixed for September 20, 1976. Central Maine complied, filing on September 14 schedules effectuating the substitute rates as well as the requested three alternatives as to rate design.

After it had completed the September 20 hearing on residential and GS–1 rate design, the Commission, on September 28, issued a document titled "Supplemental Order No. 1." It approved the schedules of substitute rates filed by Central Maine on September 14, except for the residential rates, and the approval included selection of one of the alternative GS–1 schedules submitted on September 14. The Commission ordered the rates thus approved to be in effect for the billings to customers reflecting meter readings made on or after October 12 (and thus for services rendered before that date).

As to the residential rates excepted from the September 28 approval, the Commission waited until October 7 before taking action. It then issued "Supplemental Order No. 2" approving one of the alternative residential rate schedules Central Maine had submitted on September 14. The residential rates thereby found just and reasonable were ordered to become operational on October 21 (again, for services rendered before that date).

### I–B. Resort to this Court.

While the proceedings before the Commission were still in process, Central Maine took steps in this Court to attack particular actions already taken by the Commission. On September 30 Central Maine complained under § 305 alleging confiscation and other legal error. As to orders already issued which it deemed "final", Central Maine also instituted a § 303 appeal. After the Commission, on October 7, filed its last order—Supplemental Order No. 2—Central Maine, on October 8, filed an amended § 305 complaint in this Court.

The same day Central Maine also moved, pursuant to § 305, to stay the effect of all Commission orders insofar as they prevented collection of the authorized substitute rates from and after October 1. By an order dated October 8, the Chief Justice (then Armand A. Dufresne, Jr.) stayed the effect of the September 1 decree and Supplemental Order No. 1 in manner permitting Central Maine to collect the substitute rates (found just and reasonable by the Commission's September 1 decree) from and after October 1, (for services rendered from and after September 1), instead of from October 12 as the Commission had ordered. As to the substitute residential rates which had not been approved until October 7, the Chief Justice left intact the Commission's order authorizing collection of the substitute residential rates from and after October 21 (for services rendered prior thereto).

### I–C. The Intervenors.

In addition to the above-described proceedings involving Central Maine and the Commission, several of the persons permitted to participate as intervenors at the Commission level (each referred to hereinafter as "intervenor") appear before this Court in various procedural postures. We place the intervenors in two groups, according to the type of rates they contest: (1) those attacking the rate structure applicable to certain heavy industrial users, notably GS–3 (a rate class different from the GS–1 to which the Commission sought to give special consideration), this group being comprised of St. Regis Paper Company, Martin Marietta Corporation, Scott Paper Company, Prime Tanning Company and Keyes Fibre Company; and (2) those contesting the residential rate structure:—the Maine Oil Dealers Association (MODA), the Attorney General of Maine and Bruce M. Reeves.

309

The concern of the intervenors is, fundamentally, with rate design rather than revenue level. All except one[1] appear before this Court as both § 305 complainants and § 303 appellants, or cross-appellants. The exact status of each is described in more detail as necessary in the ensuing discussion.

## II. The Nature of the Issues.

For convenience, the issues raised by Central Maine and the various intervenors may be placed in two classes: (1) questions which we may loosely call "preliminary", involving the timeliness of actions, contents of pleadings and "standing" of various of the intervenors; and (2) issues concerned with the "merits", as subdivided into (a) the claims of Central Maine that the Commission erred in determining the justness and reasonableness of rates as concerned with the level of revenue to be allowed and (b) the contentions of Central Maine and also the intervenors that the Commission was wrong in its approach to particular rate designs.

## III. The "Preliminary" Issues.

### III–A. The Section 69 Suspension Period.

■ Central Maine contends that the Commission failed to adjudicate concerning the justness and reasonableness of its proposed $21 million increase during the period the Commission was empowered to keep the proposed increase suspended. As its premise for this contention, Central Maine asserts an interpretation of § 69 like that of New England Telephone and Telegraph Company in the recent case of New England Telephone and Telegraph Company v. Public Utilities Commission, Me., 376 A.2d 448 (1977). Relying on such interpretation, Central Maine argues that its proposed increase in rates had become effective by

operation of law under § 64 because, says Central Maine, the maximum time allowable for suspension of the rates "proposed" by Central Maine had expired prior to September 1, 1976, the date of the Commission's "principal" decree.

In New England Telephone, supra, we rejected the interpretation of § 69 which Central Maine makes the foundation of its present argument, and that decision is controllingly dispositive of the issue as here raised by Central Maine.

### III–B. Section 305 Jurisdiction of Claims Other Than Those of Constitutional Deprivation.

■ In a threshold attack on the status of the intervenors, Central Maine asserts that we must construe § 305 to require dismissal of all § 305 complaints which allege only non-constitutional errors.

We disagree.

This issue was reserved in Lewiston, Greene and Monmouth Telephone Company v. New England Telephone and Telegraph Company, Me., 299 A.2d 895, 905 (1973). However, we stated in dictum in New England Telephone & Telegraph Company v. Public Utilities Commission, Me., 354 A.2d 753, 766 (1976), that § 305 confers jurisdiction on this Court as to two kinds of legal error, not one.[2] We now give that dictum decisional force.

Section 305 provides in pertinent part: "Notwithstanding sections 303 and 304, in all cases in which the justness or reasonableness of a rate, toll or charge by any public utility or the constitutionality of any ruling or order of the commission is in issue, the law court shall have jurisdiction upon a complaint to review, modify, amend or annul any ruling or order of the commission . . . ." (emphasis supplied)

---

1. Keyes Fibre Company has not instituted a complaint pursuant to 35 M.R.S.A. § 305 but seeks relief only by way of appeal under § 303. Additionally, the Attorney General has abandoned in his brief and at oral argument his complaint under § 305. That complaint remains for our consideration, however, since his co-plaintiff, Maine Oil Dealers Association, has not indicated a similar inclination to withdraw the § 305 action.

2. We agree with the contention of the intervenors that Central Maine's citation of the New England case in support of its position reveals an erroneous conception of what we there said.

This language of § 305—couched in the disjunctive—signifies that the problems contemplated comprise two types, one of which need not involve issues of constitutional dimension. Other textual language confirms that the legislative use of the disjunctive was deliberate. Immediately following the sentence above quoted, § 305 provides:

"*If in such complaint it is alleged that confiscation of property or other violation of constitutional right results* from such ruling or order, the law court shall exercise its *own independent judgment* as to both law and *facts.*" (emphasis supplied)

The second paragraph of the statute begins:

"No evidence beyond that contained in the record of the proceedings had before the commission shall be introduced before the court, *except that in cases where issues of confiscation or of constitutional right are involved* the court may order such *additional evidence* as it deems necessary for the determination of such issues to be taken before the commission . . . .." (emphasis supplied)

All of the emphasized language indicates that this Court's jurisdiction under § 305 extends to issues involving the "justness or reasonableness of a rate, toll or charge" as deemed to be separate and distinct from the constitutional issues as to which alone § 305, in the version applicable to this case,[3] gave this Court special powers to review facts.

■ Beyond the import of this textual language we have persistently viewed our jurisdiction under § 305 as sounding in equity, thus to empower us to prevent irreparable injury where there is no adequate remedy at law:—as, for example, where an interlocutory order is not yet appealable under § 303. *Lewiston, Greene and Monmouth Telephone Company v. New England Telephone and Telegraph Company,* supra,

at pp. 902–909; see also *New England Telephone & Telegraph Company v. Public Utilities Commission,* Me., 329 A.2d 792 (1974); *New England Telephone & Telegraph Company v. Public Utilities Commission,* Me., 354 A.2d 753, 767 (1976). It has never been contended until now that the Legislature intended to modify this traditional equity jurisdiction so radically as to eliminate it for injuries which, though irreparable, are without constitutional dimension. Appropriately, we invoke the well-settled rule that

"ordinarily a . . . statute will not be considered as intending a reversal of long-established principles of law and equity *unless legislative intention to do so unmistakably appears.*" *General Motors Acceptance Corporation v. Colwell Diesel Service & Garage, Inc.,* Me., 302 A.2d 595, 599 (1973) (emphasis in original)

We therefore reject Central Maine's contention that we lack jurisdiction of the § 305 complaints of the intervenors raising issues as to the "justness and reasonableness" of rates which may be other than constitutional.[4]

### III–C. The Timeliness of Particular Section 305 Complaints.

■ Central Maine asserts that the § 305 complaints of Martin Marietta Corporation (filed October 5), MODA (filed October 8) and Bruce M. Reeves (filed October 13) were filed too late, and this Court therefore lacks jurisdiction to consider them.

The foundation of this contention is Central Maine's assumption that the 30-day period within which a § 305 complaint must be filed commenced here with the date of the "principal" decree, September 1, 1976, rather than the date of Supplemental Order No. 1 (September 28) dealing specifically with the GS–3 schedules which are Martin

---

3. As mentioned in n. 14 of *Mechanic Falls Water Company v. Public Utilities Commission,* Me., 381 A.2d 1080 (1977) the provision of § 305 relating to the Law Court's "independent judgment" as to "facts" was repealed by P.L. 1977, Chapter 461.

4. It is thus unnecessary that we consider whether a *ratepayer* may have an "entitlement" to a level of rates the deprivation of which might give rise to a constitutional claim of confiscation. See, for example, *Georgia Power Project v. Georgia Power Company,* 409 F.Supp. 332, 340–341 (N.D.Ga.1975).

Marietta's concern, and the date of Supplemental Order No. 2 (October 7) directed to the residential rates in which MODA and Reeves are interested.

In *Mechanic Falls Water Company v. Public Utilities Commission,* Me., 381 A.2d 1080 (1977) we decided that where the Commission deals with the subject-matter involved by several orders directed to various phases of the subject, one seeking to assert aggrievement through a § 305 complaint, even though entitled to proceed against such orders as may be *interlocutory,* also has the option to await the outcome of all of the orders comprising the Commission's ultimately definitive *final* judgment on those issues which are the source of aggrievement. Such is the situation here, and, therefore, under the controlling precedent of *Mechanic Falls,* supra, (1) Martin Marietta's § 305 complaint was timely filed because brought within 30 days of Supplemental Order No. 1 (September 28) and (2) the § 305 complaint of MODA was seasonably instituted because filed within 30 days of the Commission's Supplemental Order No. 2 (October 7).

### III–D. The Timeliness of the Section 303 Appeal of Martin Marietta Corporation.

■ Central Maine's attack on the timeliness of the § 303 appeal of Martin Marietta Corporation similarly fails. Central Maine erroneously fixes the commencement of the 30-day appeal period[5] as the date of the "principal" decree, September 1. As above indicated however, under *Mechanic Falls,* supra, the final judgment of the Commission in relation to the subject-matter which is Martin Marietta's concern was entered on September 28 when the Commission filed

its Supplemental Order No. 1 claimed by Martin Marietta as the source of its aggrievement.

### III–E. The "Standing" of MODA and the Attorney General.

Central Maine objected at the Commission level to the intervention of MODA and the Attorney General, and renews that objection before this Court. Before us Central Maine adds to its original claim, contesting the Commission's authorization of intervention in the first instance, a further contention that neither MODA nor the Attorney General has "standing" to appeal under § 303 or to complain under § 305.

### III–E–1. The Standing of MODA.

MODA, an association of approximately 500 oil space heating dealers of this State, sought intervenor status on the basis, fundamentally, that the rates charged by Central Maine in connection with electric space heating represented unfair competition.[6] Opposing MODA's intervention, Central Maine maintained that its status as merely a competitor (in some degree) was insufficient under the standard prescribed in the Commission's Rule 16. Promulgated pursuant to Commission power granted by 35 M.R.S.A. § 3, Rule 16.1 permits intervention only by:

> "[p]ersons, . . . who are directly and substantially affected by the proceeding."

■ We agree with Central Maine that MODA was not entitled to intervenor status in this rate investigation and lacks standing to have judicial review of the

---

**5.** Section 303, unlike § 305, omits an express specification of the time within which appeals shall be taken. *Mechanic Falls,* supra, settles that § 303 incorporates by reference pertinent statutes and the Rules of Civil Procedure and also that 14 M.R.S.A. § 1851 and Rule 73 M.R. Civ.P., which together provide for an appeal period of 30 days in civil actions, establish that § 303 appeals must be brought within 30 days from the entry of a final judgment of the Commission as a claimed source of aggrievement.

**6.** At oral argument the interest of MODA, as variously purported to be asserted in the voluminous record in this case, was explained as centering about the basic contention of MODA that Central Maine charges for residential space heating at less than cost in order to obtain new customers whom it will charge more in the future. See, for example, the claims of a fuel oil dealer in *Cole v. Washington Utilities and Transportation Commission,* 79 Wash.2d 302, 485 P.2d 71, 90 P.U.R.3d 62, 63, 64 (1971).

Commission's order.[7] In our opinion (1) MODA is outside the class whose interests the rate regulation facets of the public utility statute seek to protect, and (2) the rate regulation objectives of the statute can be realized without need to confer intervenor status in a rate investigation on private entities such as MODA.

The primary objective of the rate regulatory provisions of the public utility statute is to assure that customers pay, and utilities receive, "just and reasonable" rates. 35 M.R.S.A. § 51; *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 376 A.2d 448 (1977). In a rate investigation, then, the Commission's basic concern is with the relationship of ratepayer to public utility (and ratepayer to ratepayer where discriminatory tariffs are at issue). We discern in the rate regulation scheme no legislative intent that the Commission take into account the interests of unregulated third parties who chance to be somewhat in competition with a regulated utility.

Various provisions relating to procedure before the Commission have a similar thrust.

As noted above, Commission Rule 16.1 authorizes intervenor status only to those "directly and substantially affected by the

proceeding." In *Eastern Maine Electric Cooperative, Inc. v. Maine Yankee Atomic Power Company*, Me., 225 A.2d 414 (1967), this Court acknowledged the strictness of this standard, as well as its wisdom, observing:

> "Rule 16 provides a reasonable and in fact a necessary requirement if the Commission is to hear and determine the cases before it promptly and effectively." (225 A.2d at 415)

Applying that strict standard, we held in *Eastern Maine Electric* that a potential competitor of the regulated entity (and a customer of one of its stockholders) lacked standing to appeal [8] from a stock-issue decision of the Commission.

■ True, we stressed in *Eastern Maine Electric* that we did not there confront a "rate case", pointing out that 35 M.R.S.A. § 171 distinguishes the powers of the Commission as to "the issue of any stocks" from its powers "in determining and fixing any rate." (225 A.2d at 416) That we now have a "rate case" before us, however, fails to diminish the force of the textual language of Rule 16 which unequivocally precludes intervenor status for persons who, even if "aggrieved" or "adversely affected", are not "directly and substantially" thus affected.[9] Cf. *Federal Communications*

---

**7.** We have previously decided in the context of public utility regulation that both intervention in the administrative proceeding under Rule 16 and subsequent attempts to seek judicial review require the same quantum of interest to confer "standing." *Eastern Maine Electric Cooperative, Inc. v. Maine Yankee Atomic Power Company*, Me., 225 A.2d 414, 415 (1967); see n. 8, infra. We therefore find legal principles governing standing to seek judicial review applicable to the question of standing to intervene in the first instance. Further, the *Eastern Maine Electric* case also makes clear that:

> "The mere fact that the Commission saw fit either erroneously or as a mere act of grace to vouchsafe status as intervenors to these parties does not establish or ensure their standing as appellants or relieve them from the necessity of demonstrating on appeal that they have a viable interest in these proceedings." Id. at 416.

**8.** In *Eastern Maine Electric* both parties ultimately held by us to lack standing had been permitted to intervene in a qualified fashion, and both had appealed under § 303. (225 A.2d

at 415) Our statement that neither had capacity to appeal necessarily decided that neither had capacity to intervene before the Commission in the first instance. See n. 5, supra.

**9.** We are aware that, by a 1975 amendment (P.L.1975, chap. 392, § 2), the Legislature has inserted in § 303 the following sentence:

> "Any person, who has opposed and participated in opposition to applications, petitions or commission proceedings upon which a public hearing was held and who is *adversely affected* by the final decision of the commission, is deemed a party for purposes of taking an appeal from such decision." (emphasis supplied)

In our view, however, the use of the italicized words does not undercut the strict standard established by Rule 16 and followed in *Eastern Maine Electric Cooperative, Inc. v. Maine Yankee Atomic Power Company*, supra. Instead, we read the addition to § 303 as designed to confer upon persons who possess requisite standing to intervene the power to appeal in

*Commission v. Sanders Brothers Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940).

■ Beyond the specific and pertinent language of Rule 16, the public utility statute, as interpreted by this Court, imposes other relatively stringent procedural requirements.

The Commission is required by statute to follow not only such rules as it may have promulgated pursuant to 35 M.R.S.A. § 3, but also the rules of procedure and evidence applicable to civil actions in the Superior Court. 35 M.R.S.A. § 308; see also 35 M.R.S.A. § 299. Provisions governing judicial review of Commission proceedings likewise tend to require compliance with rules developed in our court system. See, e. g., *Board of County Commissioners of the County of Washington v. Maine Central Railroad Company,* Me., 343 A.2d 877 (1975). But see P.L.1975, chap. 392, § 2 and n. 8, supra. Indeed, *In the Matter of the Pittston Company Oil Refinery and Marine Terminal at Eastport,* Me., 375 A.2d 530 (1977) (Board of Environmental Protection) we made explicit comment upon the contrast between the highly structured proceedings before the Public Utilities Commission and those of the more informal administrative agencies.

Finally, the Legislature has been narrow in granting authority to private entities to invoke the public utility rate regulation process. 35 M.R.S.A. § 291 requires ten aggrieved persons to initiate a petition for a rate investigation. Further, § 291 prohibits the Commission from proceeding with such investigation unless it is "satisfied that the petitioners are responsible."

Mindful of these and other statutory provisions indicating the orderly, court-like nature of proceedings before the Commission, we noted in *Board of County Commissioners of the County of Washington,* supra, this Court's longstanding practice of

"examin[ing] closely proceedings of the Commission to ensure that they comply with statutory and other standards. See: *Eastern Maine Electric Cooperative, Inc. v. Maine Yankee Atomic Power Company,* supra." (343 A.2d at 881)

We conclude that by force of the legislative regulatory scheme, as well as the Commission's own implementation thereof in the appropriate exercise of its rule-making powers,[10] MODA lacked the requisite interest to be an intervenor before the Commission and to have standing before this Court to claim error in rulings or orders of the Commission.

The objectives of the public utility statute will be adequately realized without the necessity of MODA's participation as a formal intervenor. As we said earlier, the rate regulation provisions of the statute contemplate regulation of the relation of ratepayer to public utility. There are other statutes which govern the relation of competitors.[11] MODA does not contend that the interests of ratepayers were insufficiently represented in the rate investigation proceeding which the Commission was here undertaking. It is true that the financial and technical resources available to MODA enabled it to provide expert testimony as to residential rate design which the average residential ratepayer might not have been able to produce. Yet, even without "intervenor" status entities such as MODA may give the Commission the benefit of the testimony of their experts. The point is illustrated in this very case by the colloquy between the attorney for MODA and Commissioner Smith:

the event they have failed to achieve before the Commission the status of being a formal intervenor. See *Board of County Commissioners of the County of Washington v. Maine Central Railroad Company,* Me., 343 A.2d 877, 882, n. 11 (1975); *In the Matter of the Pittston Company Oil Refinery and Marine Terminal at Eastport,* Me., 375 A.2d 530, 532, n. 3 (1977). Cf. 5 M.R.S.A. § 2451.

**10.** Rule 16 has remained in effect without legislative objection for some 15 years, and it fits

the special, quasi-judicial nature of this particular administrative agency. We thus have no hesitation in attributing to Rule 16 the force of law.

**11.** See 10 M.R.S.A. § 1101, et seq. In fact, one section specifically prohibits selling at lower than cost with the purpose of destroying competition. 10 M.R.S.A. § 1207.

"COMMISSIONER SMITH—I'd like to ask why your one expert witness can't contribute to this hearing as a witness rather than as an intervenor?

"MR. HALEY—Well, primarily for the . . . reason that . . . we would like to place ourselves in a position where we could appeal a decision of the Commission and this can only be, it's my understanding, it can only be effectuated by being granted intervenor status."

In short, intervenor status was sought here to guarantee a right of judicial review rather than to make possible the presentation of testimony.

Lastly, as clarified hereinafter in Part III–E–2, the common law powers of the attorney general may often be available, either on his own motion or at the relation of a private individual, to make the Commission accountable in the public interest. See *Lund ex rel. Wilbur v. Pratt*, Me., 308 A.2d 554 (1973); *State v. Lane & Libby Fisheries Company*, 120 Me. 121, 113 A. 22 (1921).

Our conclusion that MODA lacks standing is in accord with the views of tribunals in other jurisdictions.[12]

In *Cole v. Washington Utilities and Transportation Commission*, 79 Wash.2d 302, 485 P.2d 71, 90 P.U.R.3d 62 (1971), for example, the Washington Supreme Court concluded that its Commission had properly denied an oil heat institute the protection of the public utility laws of that State. The New York Public Service Commission has pointedly instructed competitors masquerading as legitimately interested consumers that their "complaints may be addressed to other forums." *Re Promotional Activities By Gas and Electric Corporations*, 68 P.U.R.3d 162, 170 (N.Y.P.S.C.1967). See also *Illinois Coal Operators' Association v. The Peoples Gas Light & Coke Company*, 7 P.U.R. NS 403 (Ill.Comm.Comm'n.1934); *Superior Propane Company v. South Jersey Gas Company*, 60 P.U.R.3d 217 (N.J.Bd.P.U.C.1965).

### III–E–2. The Standing of the Attorney General.

Because the Attorney General is a public-official with special powers and responsibilities, his interests, as claimed to warrant intervenor status in a rate investigation, raise questions separate and distinct from those above discussed concerning the standing of private entities such as MODA.

The Commission here granted leave to the Attorney General to intervene in purported dual capacities: (1) to represent the interests of the State of Maine as a ratepayer, and (2) to represent the interests of the entire Maine public. From the outset, however, the Attorney General indicated primary interest in the area of rate design. As the investigation progressed, it became increasingly evident that his special concern was to influence the *structure* of *residential* rates, and, indeed, this is the sole issue he raises in his § 303 appeal of the Commission's decision.[13]

Central Maine opposed the granting of intervenor status to the Attorney General because, in its view, the Attorney General's initial reference to his representation of the State as an individual ratepayer was merely an attempt to disguise his interest in residential rates, an interest—says Central Maine—which confers neither power to intervene at the administrative level nor standing to have judicial review of the Commission's decision.

■ In evaluating the Attorney General's interests in a rate investigation, we look not only to the provisions of the public

---

12. We are mindful that this Court once reviewed a decision of the Commission at the instigation of fuel oil dealers. *Gifford v. Central Maine Power Company*, Me., 217 A.2d 200 (1966). We distinguish *Gifford* because, first, the dealers there also established their status as residential ratepayers, and claimed aggrievement as such, see, e. g., *Cole v. Washington*

Utilities and Transportation Commission, supra, and, second, the standing issue was not raised in *Gifford* for the Court's explicit consideration.

13. The Attorney General has abandoned the claims made in his joint § 305 complaint with MODA. See n. 1, supra.

utility statute but also to other statutes and decisional law bearing on the functions of the Attorney General as a public official.[14]

In this specific respect 5 M.R.S.A. § 191 has key significance. It provides, as here pertinent:

"The Attorney General, . . . shall appear for the State, the head of any state department, the head of any state institution and agencies of the State in all civil actions and proceedings in which the State is a party or interested, . . in all the courts of the State; and in such actions and proceedings before any other tribunal when requested by the Governor or by the Legislature or either branch thereof."

The statute thus reveals a sharp differentiation of responsibility. The Attorney General has responsibility to appear for the State, automatically, whenever the State is a party or is "interested" in a judicial proceeding. Where, however, the forum is other than judicial—for example, administrative, as here—the Attorney General is without responsibility in the absence of an express request from the Governor, the Legislature or either branch thereof.

The Attorney General has not alleged, or proved, such a request in this case and has therefore failed to bring himself within the scope of his duties as specifically imposed by 5 M.R.S.A. § 191.

■■■ This does not end the inquiry, however, since the Attorney General asserts that § 191 does not displace other, common law powers reposing in him which permit his intervention before the Commission.

While we agree that there may be common law powers authorizing the participation of the Attorney General in Commission proceedings in particular limited instances,[15] we find it unnecessary here to ascertain their nature and scope. We decide that regardless of whether the Commission was right or wrong to permit the Attorney General's intervention in the first instance, we must dismiss his appeal.

As we previously mentioned, at the time the Commission granted the Attorney General leave to intervene the Attorney General claimed to represent the interest of the State as an individual ratepayer as well as the interest of the public at large. In his appeal to us, however, he raises *only* the issue of *residential* rate structure.

This is not germane to his interests in either of the above two capacities. Nothing of record shows that the State pays *residential* rates. Moreover, as representing the *whole* of the Maine public, or even *all ratepayers*, the Attorney General cannot have standing to assert the interests of only one segment of ratepayers, the residential—in particular when, as here, such representation might be to the detriment of other groups of ratepayers. It is not open to the Attorney General to act in this manner under the broadest views of his common law powers. Cf. *Petition of Public Service Coordinated Transport*, 5 N.J. 196, 74 A.2d 580 (1950).

The § 303 appeal of the Attorney General must be dismissed.[16]

---

14. The public utility statute itself is not without references to the Attorney General. As is the case with certain other administrative agencies, he is directed to enforce orders of the Commission. 35 M.R.S.A. §§ 8, 295. In our view these provisions are not intended as exclusive statements of his powers in relation to proceedings of the Commission.

15. See discussion in Part III–E–1, supra; *Lund ex rel. Wilbur v. Pratt*, Me., 308 A.2d 554 (1973); *State v. Lane & Libby Fisheries Company*, 120 Me. 121, 113 A. 22 (1921). See also P.L. 1905, chap. 162, § 1, the predecessor of the above-quoted portion of present 5 M.R.S.A. § 191, which was entitled "An Act *enlarging*

the Duties . . . of the Attorney General." (emphasis supplied)

Courts in other jurisdictions have recognized among the common law powers of attorneys-general intervention in public utility regulatory proceedings in certain instances. *Petition of Public Service Coordinated Transport*, 5 N.J. 196, 74 A.2d 580 (1950); *State v. New Jersey Bell Telephone Company*, 30 N.J. 16, 152 A.2d 35 (1959); *State ex rel. Olsen v. Public Service Commission*, 129 Mont. 106, 283 P.2d 594 (1955).

16. This resolution of the status of the Attorney General makes unnecessary our consideration of the problem arising when a person who may have intervenor standing at the commencement

## II–E–3. Standing under Section 305 in Contrast to Section 303.

The foregoing discussion has proceeded without reference to possible distinctions between the § 303 "appeal" and the § 305 "original action" by complaint. *Eastern Maine Electric Cooperative, Inc. v. Maine Yankee Atomic Power Company,* supra, the case interpreting and applying Commission Rule 16, dealt only with a § 303 appeal. Although § 305 clearly contemplates that it is to be invoked following some kind of Commission action—so that in many cases questions of standing will have previously arisen—§ 305 contains no stated limitation of the class of persons entitled to complain under its provisions. Moreover, unlike § 303, § 305 omits reference to rules of court which express such limitations.

While it may thus be arguable that "standing" is more easily achieved under § 305 than under § 303, we need not presently address the question as it here arises in relation to the Attorney General or MODA. The Attorney General has abandoned his § 305 complaint. (n. 1, supra) As a § 305 complainant, MODA alleged "confiscation" but failed to offer proof to establish such claim.[17] In addition, MODA has invoked none of the equity jurisdiction which § 305 confers; MODA neither alleged, nor proved, that Commission action caused it irreparable injury for which there is no adequate remedy at law. In sum, MODA addresses none of the areas of § 305 jurisdiction heretofore recognized by us as distinguishing that section from § 303. See *New England Telephone & Telegraph Company v. Public Utilities Commission,* Me., 354 A.2d 753, 765–770 (1976).

## IV. The "Merits" Issues; Central Maine's Contentions.

### IV–A. Attrition.

Citing the inflationary and other pressures of recent years, particularly 1975, Central Maine asserts legal error in the Commission's alleged failure either: (1) to grant an "attrition"[18] allowance designed to ensure that the rate of return contemplated by the September 1, 1976 decree may be realized despite such pressures, or (2) to achieve the same end by utilizing a year-end rate base.[19]

In its September 1, 1976 decree the Commission found as a fact that the attrition experienced by Central Maine during the severe 1975 recession would not recur in the near future to which the proposed and substitute rates would be applicable. It therefore concluded that

"Central Maine neither requires nor is entitled to an attrition allowance in this case."

The Commission adheres to this view before us, arguing that (1) Central Maine failed to carry its burden of persuading the Commission that future attrition would occur, 35 M.R.S.A. § 307, and (2) there is substantial evidence to support the factual finding that such attrition would not occur in the relevant future, *Casco Castle Company, Petitioner,* 141 Me. 222, 42 A.2d 43 (1945). It was therefore entirely proper, says the Commission, that it refuse to employ any device whatever to account for attrition.[20]

We sustain the Commission's conclusion, holding it justified in the instant circumstances.

*New Jersey Bell Telephone Company,* 30 N.J. 16, 152 A.2d 35, 41–42 (1959).

of the investigation later abandons his concern with the areas which supported his initial intervenor status.

**17.** Again (see n. 4, supra), we have no need, in light of this failure, to decide whether a ratepayer possesses an "entitlement" sufficient to invoke the protections of the due process clause of the 14th Amendment.

**18.** "Attrition", the tendency of the actual rate of return to diminish, has been said to result from two factors:—(1) steadily increasing construction costs, and (2) calculation of the rate of return in the year prior to that for which the return is calculated. See, generally, *State v.*

**19.** The Commission utilized, instead, an average of rate base over the test year.

**20.** At oral argument the Commission asserted that computation of the rate base and appropriate rate of return thereon itself reflects factors such as attrition and adjusts for them in the result. Since, however, the Commission here expressly found that attrition would not be operating in any event, we need not consider the validity of this assertion.

Central Maine does not press the alleged error as one resulting in confiscation and thus requiring a special approach by this Court to the review of facts, pursuant to § 305. Instead, we reach the matter as an incident of the § 303 "appeal", and our review of the Commission's fact-finding is in accordance with the usual test on appeal, whether there was substantial evidence to support the Commission's findings. *Casco Castle Company, Petitioner*, supra.

Evidence relevant to the matter of attrition was adduced from two sources. First, Central Maine produced its financial vice president who related the company's experience with attrition in the recent past, especially 1975. From this it was to be inferred, according to Central Maine, that the experience would recur in the relevant future. Second, the Commission's Staff produced an independent consultant who testified and presented a study concluding that Central Maine could expect a slight increase in its actual return in the near future—that is, no attrition. The study utilized growth rates and other data from years considered more "normal" than 1975. Central Maine attacked the use of such data as improper methodology.

The Commission decided, first, that this attack of Central Maine on the Staff study was not justified. It then accepted the study as "reasonable" for purposes of estimating future attrition. After an adjustment in Central Maine's favor,[21] the Commission recomputed the attrition factor and concluded that no future attrition had been shown.

We find no error in the findings and reasoning of the Commission as set forth in its September 1, 1976 decree.

At most, the Commission was faced with a conflict in the evidence.[22] Central Maine

urged an inference from past experience, that such experience—attrition—would occur in the relevant future. The Staff study, also based on the past but emphasizing a greater range of years, led to a contrary conclusion. The Commission's choice to rely on the Staff study was properly within its powers.

■■■■■ Neither do we discern error in the rejection of most of Central Maine's attack on the methodology of the Staff study. Choice of method to compute such factors as attrition, at least in the realm where rational persons could disagree, belongs to the Commission. *State v. New Jersey Bell Telephone Company*, 30 N.J. 16, 152 A.2d 35, 43 (1959); *Public Service Commission of Maryland v. Baltimore Gas and Electric Company*, 273 Md. 357, 329 A.2d 691, 697 (1974); *Rhode Island Consumers' Council v. Smith*, 113 R.I. 232, 319 A.2d 643 (1974). This Court has made clear, in the context of regulating this very public utility, that the experience of one test year is not the sole factor to be considered by the Commission. *Central Maine Power Company v. Public Utilities Commission*, 153 Me. 228, 242, 136 A.2d 726, 21 P.U.R.3d 321 (1957).

We find support in the decisions of other courts and commissions for our approval of the Commission action here.

In *Southwestern Bell Telephone Company v. Kansas State Corporation Commission*, 192 Kan. 39, 386 P.2d 515, 553, 51 P.U.R.3d 113, 155 (1963), the Court upheld the decision of the regulatory agency that no attrition allowance would be proper since no future attrition had been shown. Further, the Supreme Court of our neighboring State of New Hampshire has made clear, by way of dictum, that it would do likewise where the evidence supported the

**21.** Central Maine had asserted error in the Staff study's handling of wages of non-hourly employees. Finding merit in these contentions, the Commission modified the study and recomputed the attrition factor. This action by the Commission indicates that it was not ignoring Central Maine's alleged attrition problem, as the company claims, but was attempting to assess it as effectively as possible.

**22.** Since the opposite results of the Central Maine testimony and the Staff study appear to derive from the divergence in "test years" utilized, the difference could be seen as one of methodology rather than one of fact.

agency's decision. In *New England Telephone & Telegraph Company v. State*, 113 N.H. 92, 302 A.2d 814 (1973), the New Hampshire Court remanded a rate case to its public utilities commission

> "for consideration and determination [of] the sole issue of whether attrition is a significant factor which has been or must be considered by the commission in arriving at a proper return for the company. The commission will indicate by findings whether attrition is such a factor . . ." (Pp. 819–820)

Cases urged to the contrary are readily distinguishable. This is not a case like *New England Telephone & Telegraph Company v. State*, supra, and *State v. New Jersey Bell Telephone Company*, supra, where the regulatory agency failed to make findings or articulate its rationale. Here, the Commission's September 1, 1976 decree contained a square finding of no future attrition and an analysis of the study supporting that finding. Neither is this a case where the Commission may have refused to heed uncontradicted evidence of future attrition, as was the situation in *New England Telephone and Telegraph Company v. Department of Public Utilities*, Mass., 354 N.E.2d 860, 864–865 (1976) and *State v. New Jersey Bell Telephone Company*, supra. The September 1, 1976 decree is replete with references to evidence supporting the ultimate finding on this issue, and Central Maine itself conceded at oral argument that the Commission has allowed adjustments for attrition in other recent rate cases.

We uphold the finding of the Commission in regard to attrition.

### IV–B. *"Flow-through" of Deferred State Income Taxes to Ratepayers.*

In computing its federal income tax liability Central Maine made an expense charge in the computation of its taxable income by the use of accelerated depreciation, as permitted by 26 U.S.C. § 167(*1*). Since its state income tax is geared to federal taxable income,[23] Central Maine likewise pays Maine income taxes by using accelerated depreciation as an expense charge.

In the instant proceedings, however, in which ratemaking issues are involved, Central Maine seeks to account for its State income tax liability as if that liability had been computed by the use of straight-line, rather than accelerated, depreciation as an expense charge in the computation of taxable income—this being a bookkeeping technique known as "normalization." See *Mechanic Falls Water Company v. Public Utilities Commission*, Me., 381 A.2d 1080 (1977).

The consequence of this "normalization" approach would be, as we said in *Mechanic Falls* :

> "[b]ecause accelerated depreciation results in a greater deduction than straight-line during the early years of an asset's life . . . [Central Maine] would be initially collecting more from . . . [its] customers than . . . [it] would be paying to the . . . [State of Maine] under . . . [its] method of accelerated taxpaying and straight-line bookkeeping." (381 A.2d at 1100)

We noted in *Mechanic Falls* that prior to an amendment in 1969 to the federal income tax law the Commission, with the approval of this Court, had denied to utilities the benefits of "normalized" accounting for depreciation and required "flow-through" to ratepayers of the benefits of the accelerated depreciation actually charged as an expense in the computation of the utility's federal taxable income. *Re: Central Maine Power Company*, 17 P.U. R.3d 452 (1957); *Central Maine Power Company v. Public Utilities Commission*, 153

---

**23.** The "Maine Income Tax Law", 36 M.R.S.A. § 5101, et seq., was enacted in 1969 and tracks its federal counterpart. See 36 M.R.S.A. § 5102–11; *Tiedemann v. Johnson*, Me., 316 A.2d 359 (1974). Section 5200 of the Income Tax Law imposes on corporations a tax on their "Maine net income." That term is defined, in § 5102–8, as "the taxable income of the taxpayer for that taxable year under the laws of the United States." "Taxable income" is defined generally in 26 U.S.C. § 63, as gross income minus certain deductions, one of which is depreciation.

Me. 228, 246–249, 136 A.2d 726 (1957). In 1970, however, as a result of the 1969 amendments to 26 U.S.C. § 167, the Commission felt constrained to reverse its previous "flow-through" policy as to property which a utility had acquired after December 31, 1969; as to property thus acquired, the Commission authorized the utility, for ratemaking purposes, to account for its federal income tax liability on a "normalized" basis.

When the State of Maine income tax became effective in 1969 by virtue of the enactment of 36 M.R.S.A. § 5101 et seq. (see n. 22, supra), the Commission adopted the policy of following the pattern established for the federal income tax: utilities would be permitted in accounting for their State income tax liability to "normalize" the accelerated depreciation charged as an expense on all qualifying property acquired after December 31, 1969.

In the instant case the Commission adopted a different position. Continuing to permit Central Maine to "normalize" in accounting for the depreciation on its post-1969 qualifying property additions charged as an expense in the computation of federal income tax liability, the Commission rejected such normalized accounting in relation to Central Maine's income tax liability to the State of Maine. The Commission required "flow-through" to Central Maine's customers of the benefits of Central Maine's lower State income tax liability existing (by virtue of charging depreciation as an expense on an accelerated rather than straight-line basis) in the earlier years of the life of property which Central Maine acquired after December 31, 1969.

Central Maine launches a two-fold attack on this approach by the Commission. First, Central Maine claims that it was arbitrary and capricious for the Commission to depart from its prior policy, and, second, Central Maine asserts that in any event the Commission violated the requirements of federal and state tax laws.

■■■■ As to the first contention, the Commission's approach need not be deemed a reversal of prior policy; it may as easily be interpreted as a decision to continue the pre-1970 policy of matching expenses to the year in which they were incurred. Even if we assume that there was a change of policy, we know of no rule which requires the Commission to adhere ad infinitum to a policy it has once adopted, and Central Maine cites none. As we have previously emphasized, the Commission has a general statutory duty to ensure operation of just and reasonable rates. The specific methodology by which it discharges this duty, is, to a great extent, within its own discretion. In this particular instance the Commission has seen fit to follow the principle of recognizing only actual expenses, and this approach has been repeatedly approved by this Court. *Central Maine Power Company v. Public Utilities Commission,* supra; *Mechanic Falls Water Company v. Public Utilities Commission,* supra.

■■■■ Also unpersuasive is Central Maine's second argument that by rejecting "normalization" in the accounting for depreciation in relation to state income taxes on qualifying property acquired by Central Maine on or after January 1, 1970, the Commission has acted in violation of federal and state tax law.

Central Maine appears to argue that, conceded 26 U.S.C. § 167(*l*) does not by its express terms prohibit the Commission's approach, the statute's policy of encouraging public utility investment in capital assets through loans in the form of deferred taxes would be undermined by the Commission's action. Further, says Central Maine, such federal policies were adopted by the Maine Legislature through enactment of the Maine Income Tax Law and thus the Commission action violates both federal and state provisions.

Central Maine relies on two sections of the Maine Income Tax Law in support of its assertions that the Maine law incorporates all policies and provisions of the federal code. Central Maine cites, first, 36 M.R.S.A. § 5102–11, which provides:

"Any 'term' used in this part shall have the same meaning as when used in a

comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required."

Second, Central Maine points to 36 M.R.S.A. § 5257, which requires Maine taxpayers to adopt for purposes of the Maine income tax the "methods of accounting" used in connection with their federal income tax returns.

In reply, the Commission contends that (1) federal law does not prevent "flow-through" to ratepayers of the benefits of accelerated depreciation, even in connection with federal taxes, and (2) in any event, the Maine Income Tax Law does not incorporate the policy, or specific provisions, of federal tax law in such manner as to produce state law prohibition of "flow-through" as here required by the Commission. The Commission believes, therefore, that it was free under both federal and state law to treat state income taxes as it did, and that its treatment was reasonable.

We need not address the first contention since we agree with the Commission's second position which is here dispositive. We decide that whatever may be the correct resolution of the issue of "normalization" versus "flow-through" in ratemaking accounting for accelerated depreciation charged as an expense in the computation of the utility's federal income tax liability,[24] such disposition would not govern the Commission's treatment of the issue in relation to the State of Maine income tax. We reject Central Maine's contention that this aspect of the federal policy, whatever it may be, is incorporated in the Maine Income Tax Law in regard to public utilities.[25]

■ In a previous encounter with the Maine Income Tax Law, we observed:

"[T]he Legislature did not undertake creation of a unique or complicated income tax scheme. Nor did it provide the vast administrative machinery which would be necessary to supply the interpretive and investigative functions of the Internal Revenue Service." *Tiedemann v. Johnson*, Me., 316 A.2d 359, 364 (1974)

In other words, the Maine Legislature elected to use the federal model for reasons of convenience and economy, not for the purpose of implementing public policies unrelated to taxation. A fortiori, the Maine Legislature did not intend the Maine Income Tax Law as a revision of public policies inherent in our public utility statute since 1913.

■ Central Maine's citation of 36 M.R.S.A. §§ 5102–11 and 5257 adds nothing to the analysis. Section 5102–11, like other sections of the Maine law which track the federal counterpart, merely attempts to resolve semantic conflicts in the interest of efficiency. *Tiedemann v. Johnson*, supra, at p. 364. In fact, as we stated in the *Tiedemann* case, we do not view § 5102–11 itself as mandating our passive acceptance of all federal interpretations of federal tax statutes. Id. at p. 365, n. 10. Section 5257 is even less relevant, for, as the Commission correctly points out, it tracks 26 U.S.C. § 446. Section 446 bears in no way whatsoever on methods of accounting for depreciation; it governs, rather, elections of "cash", "accrual", "installment" and like methods.

■ We thus conclude that under present state and federal law the Commission's manner of resolving the "normalization"—"flow-through" issue in the treatment, for ratemaking purposes, of the accelerated depreciation taken as an expense in the computation of federal income tax

**24.** In *Mechanic Falls Water Company v. Public Utilities Commission*, supra, we decided that as to both the utility's federal and state income tax liability, the Commission acted without error in refusing to permit "normalization" accounting for accelerated depreciation on qualifying property acquired by the utility prior to January 1, 1970. However, as shown by n. 34 of that opinion, we expressly left open the proper treatment, in ratemaking, of the "nor-

malization" versus "flow-through" issue as to depreciation charged on property acquired on or after January 1, 1970.

**25.** Central Maine does not contend, and we discern in the language of § 167 no evidence, that the United States Congress intended to prevent enactment of different provisions in the various state income tax laws.

liability has no controlling bearing on the Commission's resolution of that issue in connection with the utility's liability for state income tax. Notwithstanding, therefore, that in the present case the Commission has seen fit to permit Central Maine to "normalize" in accounting, in the ratemaking process, for the accelerated depreciation taken as an expense charge in the computation of its federal income tax liability, the Commission was free to refuse to permit such "normalization" accounting and to require "flow-through" to Central Maine's customers of the Maine income tax benefits which Central Maine had derived by using accelerated (rather than straight-line) depreciation in the computation of its state income tax liability. This being so, the reasonableness of such decision by the Commission has already been resolved by this Court in the Commission's favor. *Central Maine Power Company v. Public Utilities Commission,* supra; *Mechanic Falls Water Company v. Public Utilities Commission,* supra.

### IV–C. Gross "Allowance for Funds Used During Construction" (AFUDC).

 AFUDC, or "Allowance for Funds Used During Construction", comprises funds spent for labor, materials and construction capital. The problem item, here, is interest incurred on the capital, which the Commission capitalizes for ratemaking purposes but which generates an income tax deduction as a current expense. Central Maine does not contest the capitalization of AFUDC. It argues, rather, that the present income tax savings attributable to the interest component should be "netted" from gross AFUDC *now,* so that the *future* ratepayers who will benefit from the completed construction also benefit from the tax savings attributable to that construction by treating the current tax deduction for interest as a future one for depreciation. Electing instead to flow through the current interest deduction to *current* ratepayers, the Commission refused to "net" AFUDC.

As the Commission points out and cases from other jurisdictions reveal, this issue involves another instance of tax "normalization." *Re: Iowa Power and Light Company,* 6 P.U.R. 4th 446, 453–456 (Iowa State Comm.Comm'n.1974); *Re: Pennsylvania Electric Company,* 10 P.U.R. 4th 351, 353–354 (F.P.C.1975). In fact, some regulatory agencies have handled the problem item in income tax calculations rather than through "grossing" or "netting" AFUDC itself. Cf. *Re: Midstate Telephone Company, Inc.,* 10 P.U.R. 4th 88, 93–95 (N.Y.P.S.C.1975), *Re: Hawkeye State Telephone Company,* 2 P.U.R. 4th 166, 176–177 (Iowa State Comm. Comm'n.1973), with *Re: Florida Power & Light Company,* 9 P.U.R. 4th 146, 160 (Fla. P.S.C.1975).

The Commission asserts that the election to "gross" or "net" AFUDC, like other questions of tax "normalization", was within its sound discretion. We agree.

The Commission rightly reads the previous cases as demonstrating the

"power [of the regulatory agency] to tailor a utility's return to the facts of the individual case, consistent with the capital costs and financial integrity of the enterprise. . . . [I]t is for the Commission to regulate the availability of . . . [tax] benefit[s] for working capital in each case by adjustment of the rate of return." *Alabama-Tennessee Natural Gas Company v. Federal Power Commission,* 359 F.2d 318, 332–333, 64 P.U.R.3d 81, 98 (5th Cir. 1966)

Thus, many agencies have elected to flow through the benefits of current tax savings to current ratepayers. *Re: Midstate Telephone Company, Inc.,* supra; *Re: Hawkeye State Telephone Company,* supra; *Re: Iowa Power and Light Company,* supra; *Re: Florida Power & Light Company,* supra. Others, citing various factors necessitating encouragement of construction at the time, have deferred the flow-through. *Re: Northern Indiana Public Service Company,* Docket No. 33920 (Ind.P.S.C., October 6, 1975); *Re Niagara Mohawk Power Corporation,* 16 P.U.R. 4th 317, 332–333 (N.Y.P. S.C.1976). Indeed, the need to tailor treatment of these tax savings to the facts of

each case has led at least one agency to utilize one method in one case and the other in another. Cf: *Re: Midstate Telephone Company, Inc.,* supra, with *Re Niagara Mohawk Power Corporation,* supra.

We conclude that the Commission's decision to flow through the benefits of AFUDC interest deductions to present ratepayers was reasonable. *Central Maine Power Company v. Public Utilities Commission,* 153 Me. 228, 246–249, 136 A.2d 726 (1957); *Alabama-Tennessee Natural Gas Company v. Federal Power Commission,* supra.

### IV–D. Effectiveness of Rates; Revenue Level and Rate Design.

In the narration of facts at the outset of this opinion we mentioned that after the Commission issued its "principal" decree on September 1, 1976 disapproving Central Maine's "proposed" rates and authorizing as just and reasonable the filing of substitute schedules of rates which, as to revenue level, would produce an annual increase of $11.4 million, the commission also set September 20 as the date of another hearing to consider the design, or structure, of (1) the non-residential, notably GS–1 rate schedules and (2) the residential rate schedules. Prior to this September 20 hearing, on September 14, Central Maine filed substitute schedules of rates purporting to effectuate as to revenue level, in compliance with the Commission's September 1 order, an annual increase of $11.4 million. Moreover, and also in accordance with the Commission's September 1 order, Central Maine's September 14 filing included schedules showing three alternatives of rate design for the non-residential and the residential classes of rates.

The Commission took no steps to allow substitute schedules of rates to become effective in any respect, even for purposes of making effective the *revenue level* increase it had approved, until the Commission had completed its September 20 hearing on *rate design.* Thereafter, on September 28, the Commission issued Supplemental Order No. 1 approving the substitute schedules of rates filed September 14, with the exception of the residential class rates, and in this approval the Commission selected one of the three rate design alternatives as to the GS–1 class submitted by Central Maine. Supplemental Order No. 1 directed that the substitute schedules approved by it go into effect for customer billings reflecting meter readings made on or after October 12 (thus covering services rendered before that date). The Commission did not approve a rate design for the residential class of rates until October 7 when Supplemental Order No. 2 was issued embodying the Commission's approval of one of the three alternatives of residential rate design filed by Central Maine on September 14. Supplemental Order No. 2 prescribed that the substitute schedules of residential rates approved go into effect on the billings to customers reflecting meter readings made on or after October 21 (thus covering services rendered before that date).

Central Maine's contentions focus upon the fact that the Commission's Supplemental Orders No. 1 and No. 2 were issued after September 1, 1976, the date of the termination of the maximum period within which the effectiveness of Central Maine's "proposed" rates could be suspended pursuant to § 69. Central Maine does not here purport to precipitate the issue, raised but not reached, in *New England Telephone and Telegraph Company v. Public Utilities Commission,* Me., 376 A.2d 448 (1977): —whether "proposed" rates under suspension become effective by operation of law should the Commission, prior to the expiration of the maximum period of suspension, fail to issue a decree incorporating substitute schedules of rates capable of being implemented by the utility without further recourse to the Commission.[26] Instead, Cen-

---

**26.** This question was answered in our decision in *Mechanic Falls Water Company v. Public Utilities Commission,* supra, in which we decided that if within the maximum authorized period during which "proposed" rates have been suspended the Commission issues a ruling which adjudicates that the "proposed" rates are neither just nor reasonable and authorizes

tral Maine here contends that once the Commission had found the "proposed" rates neither just nor reasonable and had prescribed substitute rates which would be just and reasonable at least in terms of revenue level, the Commission was required to put the substitute rates into effect as of the date on which they were adjudicated just and reasonable as to revenue level, notwithstanding that the actual *schedules* of rates reflecting such just and reasonable revenue level could not be, and were not, approved until later.

*Mechanic Falls Water Company v. Public Utilities Commission,* supra, also dealt with this issue, and in that case Central Maine's present position was essentially rejected. In *Mechanic Falls,* however, we did not confront the additional factor, present here, that after the public utility had filed substitute rates which were found to conform to the revenue level found just and reasonable by the Commission, the Commission delayed ordering them into effect until the Commission had satisfied itself about particular facets of *rate design.* The question thus posed requires that we now examine the duties of the Commission specifically in terms of differentiating between the Commission's functions as to a just and reasonable revenue level to be produced by rates and the *structural design* which is to exist among rates as embodied in *schedules.*

■ We decide that in a rate investigation pursuant to § 64 and § 69 two duties of the Commission are primary: (1) to determine whether or not the rates "proposed" in a filing under § 64 are just and reasonable, and, if they are not, to "fix" substitute rates which are just and reasonable; and (2) where the Commission fixes substitutes rates, to approve the substitute rates as placed on file and, upon approval, to order the filed substitute rates into effect.

■ As to the first of the above-described responsibilities, if the Commission is satisfied that "proposed" rates are neither just nor reasonable, the Commission prevents them from ever becoming effective by operation of law if prior to expiration of the period during which their effectiveness has been suspended pursuant to § 69, the Commission issues a "principal" decree adjudicating the "proposed" rates neither just and reasonable and fixing substitute rates which are just and reasonable in terms of the *total revenue level* they will generate. *Mechanic Falls v. Public Utilities Commission,* supra.

■ The Commission's second responsibility of approving and putting into effect substitute rates placed on file by the utility which are found to comply with the Commission's requirements of a just and reasonable *revenue level* may, but need not, be performed prior to expiration of the suspension period.[27] If this second responsibility will not be discharged until after the suspension period has expired, the Commission must perform it as soon thereafter as it is reasonably possible for the Commission to satisfy itself that the substitute rates filed by the utility conform to the revenue level prescribed as just and reasonable in the Commission's "principal" decree.

These conclusions derive from the practical realities reflected in the public utility statute as a whole, as well as the specific language of § 295:

"... [the utility] shall make such changes in its schedules on file as may be necessary to make the same conform to said order."

Section 295 further states:

"Copies of all orders of the commission, ... shall be delivered to the public utility affected thereby and the same shall take effect within such time *there-*

substitute rates which are just and reasonable as to revenue level, the Commission has thereby done enough to prevent the "proposed" rates from ever becoming effective by operation of law.

27. To require that both the utility's filing of substitute rates and the Commission's inspection and approval of them after they have been filed must occur prior to expiration of the max-

imum period of suspension achieved by the Commission in the exercise of its powers under § 69 would be to engage the Commission in difficult speculation about the amount of time necessary to accomplish its acts. We believe that it was not within the Legislature's intendment to involve the Commission in such unproductive endeavors.

*after* as the commission shall prescribe." (emphasis supplied)

■ The quoted language embodies a legislative mandate that substitute rates filed by a utility to conform to a Commission order prescribing a just and reasonable total revenue level "shall" not "take effect" until *after* the Commission has first examined and then approved the filed schedules of substitute rates. Accordingly, the Commission lacks power to establish an effective date for substitute rates which antecedes the date of the Commission's approval of the substitute rates filed by the utility. *Mechanic Falls Water Company v. Public Utilities Commission*, supra.

The question which remains concerns the role of the Commission in relation to the rate design among various rates as embodied in schedules, and how that role fits into the above-described statutory scheme.

■ That the Commission properly has such a role appears, at least by inference, from the numerous statutory references to "schedules" and the statutory authorization in § 69 for the Commission to investigate the "propriety" of "changes proposed to be made in any *schedule* of rates." [28] (emphasis supplied) This language indicates legislative intendment that the rate design among rates, as well as the revenue level they will generate, must be given Commission attention as a facet of "ratemaking."

■ As shown by our immediately preceding discussion we are satisfied, however, that the Commission's suspension power to prevent the effectiveness of "proposed" rates is geared, in its essence, to protect consumers against rates which are neither just nor reasonable in terms of the *total*

*amount of revenue* they will produce. This is the conception underlying our decision in *Mechanic Falls v. Public Utilities Commission*, supra, that the Commission prevents proposed rates from ever becoming effective by operation of law if the Commission, prior to the expiration of the period during which the effectiveness of proposed rates has been suspended, comes forth with a "basic" or "principal" decree determining that the total revenue level which will be produced by "proposed" rates on file is neither just nor reasonable and fixing a total *revenue level* just and reasonable for substitute rates to generate. Of course, the Commission, should it have the time, may see fit to deal in such principal decree also with the matter of the design among rates as they are to be embodied in schedules, either indicating the formal outlines of such design or addressing it more in detail. Rate design is, however, an optional rather than necessary facet of the "principal" decree, as it functions to prevent "proposed" rates from ever becoming effective by operation of law. This being so, the Commission's primary responsibility is to deal on a *high priority* basis with that which is the *necessary* aspect of its principal decree. The Commission therefore must not delay, pending further investigation of *rate design*, approving and ordering into effect substitute rates filed by the utility which are found to conform to the *total revenue level* prescribed by the "principal" decree as just and reasonable.

■ Proceeding from the foregoing analysis of the regulatory scheme, we conclude that the Commission's "principal" decree of September 1, 1976 was a timely discharge of the Commission's responsibility

---

**28.** We conclude that the . use of the word "schedules" in § 64 and § 69 does not import that the only permissible Commission response to filing of "schedules" is an order of new "schedules." As our historical review of the public utility statute in *New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 354 A.2d 753, 756–764 (1976) demonstrated, § 64 originally served as the vehicle for unilateral change in rates by all public utilities. In fact, it still serves that function in regard to transportation of freight. It is

logical, then, that § 64 would use the term describing the last step necessary to accomplish the effectuation of a rate, namely, a "schedule." The addition of § 69 in 1917—allowing the Commission to stay implementation of rates proposed under § 64 pending its investigation of their justness and reasonableness—necessitated no change in this terminology since the proposed rates could go into effect automatically after a certain period of time, as before, if the Commission did not act.

to "fix" a just and reasonable revenue level to be produced by rates. The consequences of this are: (1) Central Maine's "proposed" rates were precluded from ever becoming effective by operation of law; and (2) once Central Maine had filed substitute rates, the Commission was required to examine them as quickly as reasonably possible and, finding them in conformity with the prescribed revenue level, to approve them and order them into effect with reasonable immediacy after such approval. We hold erroneous, therefore, Central Maine's contention that the Commission should have ordered the substitute rates filed by Central Maine effective as of the date of the Commission's principal decree fixing the total revenue level which it would be just and reasonable for rates to produce. *Mechanic Falls v. Public Utilities Commission*, supra.

 We must decide further, however, that the Commission committed error when it delayed the effectiveness of the substitute rates filed by Central Maine until a time after the Commission had undertaken and completed an investigation of the appropriateness of particular rate designs.[29] Central Maine responded to the September 1, 1976 decree by filing on September 14, 1976 all of the tariffs requested by the

Commission. None of the parties before us contends that this filing by Central Maine was untimely.[30] It was then the Commission's duty on a high priority basis to inspect the substitute rates Central Maine had placed on file, approve them if they produced the prescribed revenue level and put them into effect at the earliest time reasonably possible. The Commission therefore erred in delaying such effectiveness of the substitute rates until after the Commission had held its hearing on September 20 and had subsequently satisfied itself as to the residential and GS–1 *rate design* which would be proper.

 We must also conclude, however, that as to this error by the Commission, and its consequences, here, (1) Central Maine's § 303 appeal is moot and (2) the error provides no basis under Central Maine's § 305 complaint for this Court to reverse, or require modification, of the Commission's orders.[31]

In analyzing the mootness of the § 303 appeal, we note that the Commission's delay until October 21, 1976 to implement the effectiveness of the substitute residential [32] rates resulted in a continuation until October 21 of the rate schedules in effect when

29. Although Central Maine does not claim error specifically in regard to the Commission's delaying the effectiveness of substitute rates during a further period until the Commission had investigated and approved rate design, Central Maine's objections relate generally to the authority of the Commission to make filed substitute rates effective after the date on which the Commission has adjudicated a just and reasonable revenue level for substitute rates. The broad outlines, therefore, of Central Maine's contention do touch upon the Commission error which we discern.

In any event, the arguments of some of the intervenors, who would have the Commission go even further beyond its statutory powers, do raise the question which we have here addressed.

30. In addition to the Commission's duty to handle its post-suspension period approval of schedules with dispatch, we believe the public utility has an analogous responsibility in regard to filing those schedules. It is true that, often, the public utility will desire to respond to the operative Commission decree with alacrity since the substitute rates thereby filed will produce higher revenues. Yet, there may be cases

where the utility's desire will be for delay and therefore it is necessary that there be a statutory duty to comply within a reasonably immediate time. See, for example, the primary Commission decree in *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 376 A.2d 448 (1977), which ordered a revenue decrease.

31. As set forth above, the Chief Justice stayed a similar Commission order allowing collection of the substitute non-residential rates from and after October 12, 1976. The Chief Justice authorized collection of such substitute rates commencing with October 1, 1976. Whether Central Maine may retain the substitute rates collected for the period October 1–12, 1976 is not being contested, here, and we intimate no opinion on the question.

32. Neither do we discern any remedy available by reason of the § 303 appeals or § 305 complaints of the intervenors since none has argued to us any issue of the effective date of rates.

Central Maine originally proposed the $21 million increase under § 64. Central Maine's § 303 appeal asserts that this Commission action was unconstitutional and otherwise unlawful because it imposed on Central Maine during the October 1–21 period the former rates which the Commission itself had concluded were too low to be just and reasonable.

For the purposes of a § 303 appeal, however, this contention suffers from the same flaw as this Court found in the utility's contention in *New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 354 A.2d 753, 765–766 (1976). We there made clear that this Court lacks power in a § 303 appeal to provide remedial relief

". . . as to a situation no longer continuing but fully terminated as of the time this Court's decision is to be forthcoming." (P. 765 of 354 A.2d)

The § 303 appeal is thus moot as to that facet in which it seeks an order of this Court awarding after-the-fact relief for rates paid in October, 1976. See also: *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 362 A.2d 741, 757–758 (1976).

▆▆ Insofar as Central Maine's § 305 complaint attacks the Commission's delay in approving the effectiveness of the substitute schedules of rates filed by Central Maine, the complaint must be denied on grounds previously discussed more fully in *New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 354 A.2d 753, 766–770 (1976). As we there explained, § 305 empowers this Court to consider only two types of alleged errors: —those concerning the "unjustness or unreasonableness of a rate" and those constitutional in nature. In *New England* we decided that the part of the complaint which alleged that the Commission had erroneously refused to exercise statutory power to institute temporary rates was not within

our § 305 jurisdiction because this claim of error was unrelated to the unjustness or unreasonableness of rates or constitutional violations. The error was therefore reviewable, if at all, only through appeal pursuant to § 303.

In *New England* the utility, like Central Maine here, also claimed that the legal error reviewable under § 303 had produced confiscation in the constitutional sense, thereby to bring the claim within the jurisdiction of this Court under § 305. We rejected New England's claims in this respect, concluding that it had not established such confiscation.

We find Central Maine, here, in a similar posture. While Central Maine in its § 305 complaint, as amended, and in its briefs asserts generally "unjustness and unreasonableness" of rates, we discern the thrust of its arguments to be, in essence, that the Commission acted unlawfully in delaying implementation of residential rate schedules until October 21, 1976, and this illegal delay caused confiscation of Central Maine property without due process of law. Cf. *New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 354 A.2d 753, 766, n. 9 (1976).

Apart from its constitutional overtones, the contention of unauthorized delay clearly concerns a matter other than the justness and reasonableness of a rate, as we have previously construed that phrase. Id. This claim was therefore reviewable, if at all, only under § 303, and our finding of mootness in regard to the § 303 aspect of the contention has disposed of the issue.

In regard to the constitutional dimension added by a claim of confiscation, we conclude that Central Maine has failed to establish injury amounting to confiscation.[33] Hence, Central Maine's § 305 complaint fails, and, as to it, judgment must be entered for defendant.

---

**33.** Our disposition of this facet of the § 305 complaint thus obviates the necessity of reaching the issues briefly sketched in *New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 354 A.2d 753, 767

(1976) concerning our power under § 305, if confiscation is established, to afford the remedial relief therefor which would be unavailable pursuant to § 303.

## V. The "Merits" Issues; Rate Design, As Attacked by Various of the Intervenors.

### V–A. Residential Rate Design, As Attacked by Intervenor Reeves.[34]

Only two Commissioners[35] signed Supplemental Order No. 2, the decree approving a traditional "declining block"[36] rate design for residential ratepayers. One of them, Commissioner Bradford, explained the reform which he and the intervenor had hoped to make in residential electricity rates:

> "CMP's chosen rate does nothing to check the mindless growth of the space heating load with its inevitably heavy contribution to the winter peak. . . . I do not for a moment believe that all electric heating customers are wealthy and can afford large increases. The point is that a rate that continues to subsidize this class of customer also continues to encourage growth in CMP's winter peak load. This is the load that requires expensive new generation and transmission facilities, and it is the load which must be presently met largely through the use of the most expensive and inefficient units in the . . . system. A rate which encourages this peak consumption artificially hurts every user, . . . because it builds the overall system costs for which everyone must pay."

Convinced that the schedules approved in Supplemental Order No. 2 were not cost-related, and were "barely . . . just, as the statute requires", Commissioner Bradford signed the order only to assure implementation of some rate other than the original $21 million increase proposed by Central Maine under § 64.

Stressing the twin goals of conservation and efficiency, intervenor Reeves charges that the failure of the Commission to complete its residential rate reform in this case led to unjust and unreasonable rates which confiscate his property. He further challenges the ultimate residential rate design as in contradiction of the specific findings of the Commission.

We disagree on both points.[37]

We find the residential rate design just and reasonable. Based on a traditional "declining block" system, it reduces the price as usage increases regardless of the actual cost of the service.[38] We know of no persuasive authority, however, and the intervenors cite none, establishing a per se rule that all utility rates must be based solely on cost factors. On the contrary, the regulatory case law of this State and elsewhere is replete with consideration of issues other than actual cost. See *Central Maine Power Co. v. Public Utilities Commission*, 150 Me. 257, 278, 109 A.2d 512 (1954); *International Minerals and Chemical Corporation v. Mayo*, 336 So.2d 548 (Fla.1976); *Florida Retail Federation, Inc. v. Mayo*, 331 So.2d 308 (Fla.1976); *Apartment House Council of Metropolitan Washington v. Public Service Commission*, 332 A.2d 53 (D.C. App.1975). See also Bonbright, *Principles of Public Utility Rates* (1969). The concept of a "just and reasonable" rate does not

---

**34.** In Part III–E, supra, we concluded that MODA and the Attorney General may not participate further in this rate case. Only one intervenor concerned with residential rates remains, namely, Bruce M. Reeves. Reeves' standing has not been challenged before us.

**35.** Commissioner Smith, persuaded that the level of revenue authorized by the September 1, 1976 decree was not just and reasonable, declined to approve residential rates producing that level. Commissioner Smith did, however, sign Supplemental Order No. 1.

**36.** Such a design provides for a lowering of the price per kilowatt hour as consumption increases.

**37.** Again, the failure of intervenor Reeves on the merits here obviates the necessity of a determination whether his interest deserves constitutional protection. See notes 4 and 17, supra. Additionally, it leaves for another day consideration of what factors the public utility statute empowers the Commission to investigate in regard to rate design.

**38.** Actually, we only assume for the sake of argument that the declining block method has little relation to cost, since the opinions of each of the three Commissioners indicates that the principal problem in the search for reform of rate design has been a paucity of information from which to draw such conclusions.

signify a particular single rate as the only lawful rate but rather encompasses a range within which rates may be deemed just and reasonable both in terms of revenue level and rate design. It is within the sound discretion of the Commission to fix the exact level and design within that range. *Potomac Edison Company v. Public Service Commission of Maryland*, 279 Md. 573, 369 A.2d 1035 (1977).

■ Finally, we reject the intervenor's characterization of the import of the Commission findings and orders. The Commission did not find that the design it decided to adopt was unjust or unreasonable, as intervenor argues; the Commission merely indicated that it would prefer a different design which it was unable presently to develop. The Commission's resort to the traditional design was therefore perfectly proper and, as we decided in Part IV–D, supra, already tardy.

*V–B. GS–3 Rates, As Attacked by Intervenors Martin Marietta Corporation, Prime Tanning Company, Scott Paper Company, St. Regis Paper Company and Keyes Fibre Company.*

Remaining to be considered are the assertions of unjust and unreasonable rates urged by certain GS–3 users, namely, Martin Marietta Corporation, Prime Tanning Company, Scott Paper Company, St. Regis Paper Company and Keyes Fibre Company. In essence, each of these heavy industrial users alleges inequities as to members of the GS–3 group in that Central Maine realizes a higher rate of return from high load factor customers within the class than from low load factor customers. In addition, all except St. Regis Paper Company argue that similar discrimination exists relative to GS–3 and other classes.

39. We are mindful of the frustrations of the intervenors and those members of the Commission who are anxious to achieve reform of rate structure. Apparently, the workload of the Commission denies it sufficient time within the § 69 suspension period to investigate rate design as well as revenue level. Since determinations as to rate design depend on the figures provided by the determination of revenue level, first priority is given to revenue level questions.

As was the case with the hotly contested residential rate design, the Commission found itself without sufficient data to remedy problems perceived in the GS–3 structure. It therefore adhered to past patterns which it found just and reasonable, if not its own optimal policy choice.

■ We conclude, as we decided in Part V–A, supra, that the Commission possesses a range of latitude in this area which it has not here abused. It found the traditional GS–3 approach just and reasonable, and the evidence supports that finding. See: *Apartment House Council of Metropolitan Washington v. Public Service Commission*, supra. The industrial intervenors have not demonstrated such "undue or unreasonable" discrimination in the GS–3 rates as would render such rates illegal. 35 M.R.S.A. § 102; *Gifford v. Central Maine Power Company*, Me., 217 A.2d 200 (1966).

Certain GS–3 intervenors also cite as error the Commission's failure to take additional evidence on the matter of GS–3 design at the September 20, 1976 hearing. Our decision in Part IV–D, supra, that such hearing was in any event an improper undertaking here, because conducted as an incident of an investigation which unduly delayed the effectiveness of filed substitute rates producing a revenue level previously adjudicated just and reasonable, disposes of this contention.[39]

The entries are:

1—As to Central Maine Power Company: Section 303 appeal denied. Judgment for defendant on Section 305 complaint.

2—As to Intervenor St. Regis Paper Company:

Thus, once again, here, the Commission has been constrained to approve a rate design which it might like to modify. We are told that the Commission is attempting a solution to its predicament by initiating a study of rate design in general outside the context of any particular rate case. There is also the possibility of a legislative solution: amendment of the public utility statute to make it more responsive to modern needs of both utilities and consumers.

Section 303 appeal denied. Judgment for defendant on Section 305 complaint.

3—As to Intervenor Martin Marietta Corporation:

Section 303 appeal and cross-appeal denied. Judgment for defendant on Section 305 complaint.

4—As to Intervenor Scott Paper Company:

Section 303 appeal denied. Judgment for defendant on Section 305 complaint.

5—As to Intervenor Prime Tanning Company:

Section 303 cross-appeal denied.

6—As to Intervenor Maine Oil Dealers Association:

Section 303 appeal, and cross-appeal, and Section 305 complaint dismissed.

7—As to Intervenor, Attorney General of Maine:

Section 303 appeal, and cross-appeal, dismissed.

8—As to Intervenor Bruce M. Reeves:

Section 303 appeal denied. Judgment for defendant on Section 305 complaint.

9—As to Intervenor Keyes Fibre Company:

Section 303 appeal denied.

POMEROY, J., did not sit.

DELAHANTY, J., sat at argument and conference but did not otherwise participate.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.