### NATURAL RESOURCES COUNCIL OF MAINE et al.

### v.

### PUBLIC UTILITIES COMMISSION

### v.

### CENTRAL MAINE POWER COMPANY.

Supreme Judicial Court of Maine.

Argued Oct. 3, 1989.

Decided Dec. 6, 1989.

Beth A. Nagusky (orally) Ronald A. Kreisman, Natural Resources Council, Augusta, for N.R.C.M.

Stephen H. Burrington, Alan Wilson (orally), Conservation Law Foundation of New England, Boston, Mass., Tybe Brett, Portland, for C.L.F.

Peter Ballou, Glen S. Goodnough (orally), Public Utilities Com'n, Augusta, for P.U.C.

Arthur Adelberg, Cent. Maine Power Co., Augusta, Gerald Amero, Kevin F. Gordon (orally), Pierce, Atwood, Scribner, Al-

---

len, Smith & Lancaster, Portland, for C.M.P.

William C. Perkins, Public Advocate, Augusta, amicus curiae.

Before ROBERTS, WATHEN, GLASSMAN, HORNBY and COLLINS, JJ.

GLASSMAN, Justice.

Natural Resources Council of Maine, an environmental organization with offices in Augusta, and Conservation Law Foundation, a non-profit law organization located in Boston, Massachusetts (Intervenors), appeal, and Central Maine Power (CMP) cross-appeals, from an order of the Public Utilities Commission (Commission) denying the Intervenors compensation under the provisions of the Public Utilities Regulatory Policies Act of 1978 (PURPA), 16 U.S. C.A. §§ 2601–2645 (West 1985). We affirm the Commission's order.

## I. *Facts and Procedure*

In 1987, CMP sought the Commission's approval to purchase substantial amounts of power from Hydro–Quebec.[1] CMP subsequently filed its petition for a certificate of public convenience and necessity pursuant to 35 M.R.S.A. § 13–B (Pamph.1986).[2] Pursuant to its own rules, the Commission then issued a public notice to potential intervenors concerning the CMP petition. In response to this notice, the Intervenors filed petitions to intervene in the proceedings. The Commission permitted Natural Resources Council of Maine, a customer of CMP, to intervene "as of right."[3] Because it was not a CMP ratepayer, the Commission denied such status to Conservation Law Foundation but permitted it to intervene as an "interested party,"[4] and consolidated the two cases. In April 1988, the Intervenors notified the Commission of their intention to seek compensation as intervenors under PURPA and Chapter 84 of the Commission's rules.[5] Under PURPA, compensation is available to a qualified intervenor who "substantially contribute[s] to the approval, in whole or in part, of a position advocated by such [intervenor] in a proceeding concerning such utility, and relating to any standard" set forth in PURPA. 16 U.S.C.A. § 2632(a)(1).

During the extended hearings that followed, the Intervenors took the position that CMP's proposed purchase of power from Hydro–Quebec was unnecessary. They contended that CMP had underestimated current and future conservation technology and maintained that most of the amount of the requested power purchase could be secured through conservation savings. The Intervenors presented five witnesses who gave general testimony concerning interruptible rates and load management techniques. 16 U.S.C.A. § 2621(d)(5), (6). They also cross-examined CMP's witnesses concerning conservation

---

1. In the same year, CMP also requested the Commission's approval of its projections of long-term avoided costs. In May 1988, the Commission approved a stipulation consolidating the two proceedings.

2. Recodified at 35–A M.R.S.A. § 3133 (1988).

3. "As of right" status is granted pursuant to 5 M.R.S.A. § 9054 (1989), which states, in pertinent part:

    **1. Intervention.** On timely application made pursuant to agency rules, the agency conducting the proceedings shall allow any person showing that he is nor [sic] may be, or is a member of a class which is or may be, substantially and directly affected by the proceeding, or any other agency of federal, state or local government, to intervene as a party to the proceeding.

4. "Interested person" status is also granted pursuant to 5 M.R.S.A. § 9054 (1989), which provides, in pertinent part:

    **2. Intervention; interested person.** The agency may, by order, allow any other interested person to intervene and participate as a full or limited party to the proceeding. This subsection shall not be construed to limit public participation in the proceeding in any other capacity.

5. Under the PURPA intervenor compensation provision, 16 U.S.C.A. § 2632(a)(2), an intervenor must seek compensation in the appropriate state court unless the regulatory authority has promulgated compensation procedures. The Public Utilities Commission promulgated such a procedure under Chapter 84 of its rules, thereby retaining intervenor compensation issues. *Re Costs of Participation in Commission Proceedings on PURPA*, 37 P.U.R. 4th 280 (Me. P.U.C. May 29, 1980).

technology. In January 1989, the Commission denied CMP's proposed purchase from Hydro–Quebec. In its order, the Commission found that "the two principal alternatives to Hydro–Quebec have not been adequately explored: energy conservation and cogeneration and small power production." The Commission ordered CMP to research these alternatives before making further requests to purchase power from Hydro–Quebec.

On April 13, 1989, the Commission also denied the Intervenors' petition for intervenor funding under PURPA and Chapter 84 of the Commission rules. The Commission held that the Hydro–Quebec proceedings were not the type of proceeding in which intervenor funding is available under PURPA because "PURPA standards have [not] been implemented in any way", and this appeal and cross-appeal followed.

## II. *Conservation Law Foundation's Standing to Appeal*

As a preliminary matter the Commission challenges Conservation Law Foundation's standing to appeal to this court. The Commission contends that Conservation Law Foundation was only admitted to the proceeding as an "interested person" under 5 M.R.S.A. § 9054(2). The Commission argues that an "interested person" lacks standing to appeal the decision of the Commission. We disagree.

Former Commission Rule 16.1 allowed intervention "as of right" to parties "directly and substantially affected by the proceeding." The Commission relies on our decision in *Central Maine Power v. Public Utilities Commission*, 382 A.2d 302 (Me.1978), appealed to this court in 1976. In that case, we stated that the standing required by an intervenor to appeal to this court was identical to that required by Commission Rule 16.1 then in effect to intervene "as of right" before the Commission. The Commission argues that this decision forecloses Conservation Law Foundation's standing to appeal.

In 1977, following the appeal in *Central Maine Power*, 382 A.2d 302, the Legislature enacted the Administrative Procedure Act, 5 M.R.S.A. §§ 8001–11008 (APA), which *statutorily* designates both mandatory intervention (party is or may be substantially and directly affected by the proceeding) and discretionary intervention (any other interested person). 5 M.R.S.A. § 9054(1), (2). The Commission rules in effect at the time of the present appeal essentially tracked these statutory provisions. 65–407 C.M.R. ch. 11, § 6(c)(1), (2) (1984).[6] By contrast, the former Commission rules governing intervention had no parallel statutory provisions, as they were promulgated by the Commission prior to passage of the APA. Present section 9054(2), however, allows any "interested person" to intervene as a full party to the proceedings.

The Commission also contends that Conservation Law Foundation lacks standing because it fails to qualify under the statute governing appeals from a Commission proceeding. 35–A M.R.S.A. § 1320(2) (1988) designates a "party for purposes of taking an appeal" as "[a]ny person who has participated in commission proceedings, *and who is adversely affected by the final decision of the commission....*" *Id.* (emphasis added). There is no dispute that Conservation Law Foundation fully participated in the proceedings before the Commission. Though Conservation Law Foundation is not adversely affected by the Commission's decision to deny CMP's request, it is affected by the collateral decision to deny intervenor funding. Accordingly, we hold that Conservation Law Foundation possesses standing to take this appeal.

## III. *The Hydro–Quebec Proceeding*

The Intervenors contend that the Commission erred in holding that the Hydro–Quebec proceeding is not the type of proceeding for which intervenor funding is available under the Public Utilities Policies Act of 1978 (PURPA), 16 U.S.C.A. § 2601–2645 (West 1985). They argue that the position advocated by them relating to

---

**6.** These rules have since been recodified with slight changes, at 65–407 C.M.R. ch. 110, §§ 720, 721 (1989). *Re Rulemaking*, No. 89–321 (Me. P.U.C. Sept. 11, 1989).

standards set forth in PURPA substantially contributed to the Commission's approval of those standards. We disagree.

PURPA was passed "to encourage (1) conservation of energy supplied by electric utilities; (2) the optimization of the efficiency of use of facilities and resources by electric utilities; and (3) equitable rates to electric consumers." *Id.* § 2611. This complex statute requires state regulatory bodies to formally "consider" "implementation" of certain ratemaking "standards" relating to energy conservation. *Id.* § 2621(a)-(c). These standards are listed as (1) cost of service, (2) declining block rates, (3) time-of-day rates, (4) seasonal rates, (5) interruptible rates and (6) load management techniques. *Id.* § 2621(d)(1)-(6).[7]

After "consideration and determination" of these standards, the state regulatory body may formally "implement" them as policy or decline to do so. *Id.* § 2621(a), (c). Section 2622 mandates a procedure whereby the regulatory body may formally consider these standards. If the standards are not formally implemented in a special proceeding, then the statute mandates consideration "in the first rate proceeding commenced after the date three years after November 9, 1978...."[8] *Id.* § 2622(c). A close examination of the provision controlling intervenor compensation, however, leads us to the conclusion, as it did the Commission, that the terms "consideration and determination" and "implementation" extend to a larger class of proceeding than described in sections 2621 and 2622. Accordingly, we find no merit in CMP's contention that it is only in a section 2621 or 2622 proceeding that an intervenor could claim compensation. Section 2632 provides for "consumer representation" and allows compensation to "an electric consumer of an electric utility [who] substantially contributed to the approval, in whole or in part, of a position advocated by such consumer in a proceeding concerning such utility, and relating to any standard set forth in subchapter II of this chapter...." *Id.* § 2632(a)(1).

Viewed in isolation, section 2632(a)(1) would appear to authorize compensation to any intervenor in a proceeding concerning an electric utility who plausibly contributes to the approval by the Commission of a PURPA standard advocated by the intervenor. This seemingly expansive provision must be related, however, to the statute's overarching purpose implicit in section 2621, which is to "implement" the stated PURPA standards. We hold that the term "implement" contemplates a proceeding involving an electric utility in which the Commission by its determination directs the utility to take definite action to carry out that PURPA standard advocated by the intervenor. *Re Costs of Participation in Electric Ratemaking Proceedings*, 37 P.U.R. 4th 259, 268–69 (Cal. P.U.C. June 17, 1980).

To determine whether "implementation" of the PURPA standards advocated by the Intervenors occurred in this instance, it is necessary to examine what actually transpired at the proceeding before the Commission. The Intervenors advocated that the Commission deny approval of CMP's proposed purchase of power from Hydro–Quebec as unnecessary. They contended that if CMP used interruptible rates and local management techniques, *see* section 2621(d)(5) and (6), these conservation measures would obviate the necessity for the purchase of Canadian power.[9] The record reveals that the Intervenors offered brief general testimony relating to load manage-

---

7. In addition to the ratemaking standards, Subchapter II of Title 16 establishes certain other standards not applicable to the issues in this case. *See, e.g.,* 16 U.S.C.A. § 2623(b)(1)-(5) (West 1985).

8. As the conference report to the statute notes, intervenors may raise these standards for consideration and implementation in subsequent rate cases, through they themselves may not initiate an "implementation" proceeding. H.R.

Conf.Rep. No. 1750, 95th Cong.2d Sess. 74, *reprinted in* 1978 U.S.Code Cong. & Admin. News 7659, 7797, 7808. In 1985, the PUC implemented these standards in a formal proceeding.

9. The record reflects that the Commission staff and two other intervenors, Alternative Energy, Inc. and No Thank Q Hydro Quebec, advocated a position similar to that of the present Intervenors.

ment and interruptible rates in other states. With one exception, the testimony did not include specific plans or recommendations for Maine.[10]

In its order denying permission to CMP to purchase power from Hydro–Quebec, the Commission determined that it was bound by the mandate of the Maine Energy Policy Act of 1988, 35–A M.R.S.A. § 3191 (1988).[11] This recent enactment requires the State to pursue a "least cost" energy plan that explores and weighs alternatives (including purchases of Canadian power) in a purely economic manner. If the alternatives are equivalent, "the commission shall give preference first to conservation and demand management...." *Id.* The Commission held that it did not have enough information to decide rationally if the purchase of power from Hydro–Quebec was equivalent to or the best choice among available alternatives. Under this ruling, future purchases from Hydro–Quebec are not excluded. The Commission did not order CMP to adopt specific PURPA standards, but merely required that prior to seeking its approval CMP thoroughly explore other alternatives including conservation and cogeneration and small power production and make the required demonstration that the proposed power purchase is superior to other alternatives.

 While the Intervenors by their advocacy may have reinforced the Commission's concern that CMP had not thoroughly explored alternatives to the purchase of power from Hydro–Quebec, it cannot be said that the Commission's decision was an implementation of PURPA standards. Instead, the Commission directed CMP to ex-

plore all alternatives to the purchase of power from Hydro–Quebec as required by 35–A M.R.S.A. § 3191. Accordingly, the Commission properly held that the Intervenors are not entitled to PURPA funding in this proceeding.

Because we are affirming the decision of the Commission, we need not address CMP's other contention in its cross-appeal that the Intervenors should not be funded because under the provisions of 16 U.S. C.A. § 2632 the Public Advocate and the Commission staff are an alternative means for assuring adequate representation of electric consumers.

The entry is:

Order of the Commission affirmed.

All concurring.

---

10. The sole exception was the testimony of Joseph Chaisson, who briefly described such measures as residential retrofitting, commercial building retrofitting and fuel shifting for new residential construction.

11. The full text of the enactment is as follows:
   **§ 3191. Energy policy**
   The Legislature finds that it is in the best interests of the State to ensure that Maine and its electric utilities pursue a least-cost energy plan. The Legislature further finds that a least-cost energy plan takes into account many factors including cost, risk, diversity of supply and all available alternatives, includ-

ing purchases of power from Canadian sources. When the available alternatives are otherwise equivalent, the commission shall give preference first to conservation and demand management and then to power purchased from qualifying facilities. Nothing in this section is intended to modify the commission's authority under section 3133, subsection 9.
   Section 3133(9) sets forth those factors that may be considered by the Commission when reviewing a petition filed after January 1, 1987, for approval of purchases of generating capacity or energy outside the state.